# STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT
## CASE NO. 25-5188

LUTHER POYNTER, BY AND                              PLAINTIFF/APPELLANT
THROUGH HIS GUARDIAN,
ANITA FERNANDEZ

vs.

AARON BENNETT, IN HIS OFFICIAL                  DEFENDANTS/APPELLEES
CAPACITY AS BARREN COUNTY
JAILER, AND BARREN COUNTY, KENTUCKY

On Appeal from the United States District Court for the
Western District of Kentucky, Bowling Green Division,
Civil Action No. 1:21-CV-162-GNS

# PETITION FOR PANEL REHEARING AND
# REHEARING EN BANC ON BEHALF
# OF APPELLEES

*/s/ Aaron D. Smith*
Aaron D. Smith
John A. Sowell
English, Lucas, Priest & Owsley, LLP
1101 College Street; P.O. Box 770
Bowling Green, Kentucky 42102
Phone: (270) 781-6500
Fax. (270) 782-7782
*Attorneys for Appellee*

i

**TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................... ii

TABLE OF AUTHORITIES .......................................................................... iii

RULE 40 STATEMENT ...................................................................................1

STATEMENT OF THE CASE..........................................................................2

    I.      FACTUAL BACKGROUND ............................................................2

    II.     PROCEDURAL BACKGROUND ...................................................5

ARGUMENT ..................................................................................................10

    I.      THE ALLEGED SUBSTANTIAL RISK OF HARM WAS NOT PERSONAL
         TO POYNTER.........................................................................10

    II.     THE RECORD IS INSUFFICIENT TO ESTABLISH A CLEAR
         AND PERSISTENT PATTERN OF UNCONSTITUTIONAL CONDUCT...........13

CONCLUSION ...............................................................................................17

CERTIFICATE OF COMPLIANCE ...............................................................18

CERTIFICATE OF SERVICE ........................................................................18

APPENDIX......................................................................................................18

ii

# TABLE OF AUTHORITIES

## CASES

*Berry v. Delaware Cnty. Sheriff's Off.,* 795 F. App'x 857, 862
(6th Cir. 2019)........................................................................................7, 14

*Board of County Commissioners of Bryan County, Oklahoma v. Brown*
520 U.S. 396, 404 (1997)...............................................................................14

*Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022)...................6

*Davis v. Chorak*, No. 22-1839, 2023 WL 2487339, at *3
(6th Cir. Mar. 14, 2023)..............................................7, 10, 11, 12, 13, 14

*Franklin v. Franklin Cnty.*, 115 F.4th 461, 472
(6th Cir. 2024)..............................................................8, 9, 14, 15, 16, 17

*Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004)....................13

*Lewis v. McClennan*, 7 F. App'x 373, 375 (6th Cir. 2001) ................................7, 12

*Little v. Corr. Corp. of Am.*, 103 Fed. Appx. 898, 900 (6th Cir. 2004) ...................13

*Monell v. Dep't of Soc. Servs.*,
436 U.S. 658 (1978)........................................................................6, 14, 17

*Reece v. Carey*, No. 22-5275, 2023 WL 3003191 *4
(6th Cir. Apr. 19, 2023)....................................................................................6

*Schoonover v. Rogers*, No. 21-3970, 2022 WL 12258998
(6th Cir. Oct. 21, 2022).........................................................8, 9, 12, 15

*Stewart v. City of Memphis.*, 788 F. App'x 341, 347 (6th Cir. 2019) ....................14

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).........................8

*Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir. 2022).......................7, 10

*Winkler v. Madison Cnty.*, 893, F. 3d 877, 902 (6th Cir. 2018)............................14

*Young v. Campbell Cnty*., F. App'x 314, 321 (6th Cir. 2021)........................9, 12, 13

**STATUTES**

42 U.S.C. §1983 ...................................................................................................1

## RULE 40 STATEMENT

A panel rehearing en banc is warranted for the following reasons:

1.  The opinion incorrectly found that Poynter presented sufficient evidence of a "substantial risk of harm" on the underlying failure to protect claim. The risk of harm was not personal to Poynter as is required pursuant to the precedent of this Court and the Supreme Court of the United States.

2.  The opinion incorrectly found that Poynter presented sufficient evidence of "clear and persistent pattern of unconstitutional conduct" based on prior incidents involving Wix and Guess. The record lacked proof that these prior incidents involved or were otherwise the result of Fourteenth Amendment violations as is required, pursuant to the precedent of this Court and the Supreme Court of the United States, to establish the "clear and persistent pattern of unconstitutional conduct" element for an actionable custom under 42 U.S.C. 1983.

# STATEMENT OF THE CASE

## I.

### FACTUAL BACKGROUND

On December 25, 2020, Luther Poynter (hereinafter "Poynter") was arrested by the Hart County Sheriff's Department for non-payment of child support and taken to Barren County Detention Center (hereinafter "BCDC" or "the jail") for booking. [R. 95-1, Page ID # 436, Mem. Supp. MSJ] [R. 95-2, Page ID # 451, Booking Sheet]. At that time, BCDC used JailTracker to complete the intake of new inmates. *Id*.; [R. 95-3, Page ID # 457, Depo. of A. Bennett]. BCDC questioned inmates extensively regarding personal and medical matters. *Id*. Inmates completed a formal, written questionnaire that became part of his/her file on JailTracker at BCDC. *Id*. A copy of Poynter's intake questionnaire can found at R. 95-4, Page ID # 515. Because Poynter had previously been incarcerated at BCDC, the completing officer was able to see Poynter's prior answers and update those pursuant to what Poynter told him on December 25, 2020. [R. 95-3, Page ID # 462, Depo. of A. Bennett]. JailTracker maintains all information for previous inmates. [R. 95-3, Page ID # 472, Depo. of A. Bennett]. This includes any prior incident reports and keep-aways entered into the system. [R. 95-3, Page ID # 472; 495, Depo. of A. Bennett] [R. 95-5, Page ID # 523, Depo. of Captain B. Boston, p. 31].

Importantly, on December 25, 2020, Poynter did not list any individuals from

2

which he needed protection. [R. 95-4, Page ID # 515, Intake Questionnaire]. It is incumbent on the inmate to notify jail staff of individuals that could pose a risk to the inmate's safety so that BCDC can ensure separation. [R. 95-3, Page ID # 471-72, Depo. of A. Bennett]. Poynter did not. If a new inmate presented a red flag during intake, such as the potential to cause harm or be harmed, the deputy conducting the intake would notify his/her supervisor for further assessment. [R. 95-3, Page ID # 466; 473, Depo. of A. Bennett]. Poynter presented no red flags. Further, the seriousness of Poynter's offense(s), or lack thereof, did not warrant him being placed in protective custody/isolation cell. [R. 95-3, Page ID # 481-82, Depo. of A. Bennett]. Had Poynter's offense(s) been serious, or had he shown indicators of propensity for violence during intake, BCDC would have placed him in a protective custody/isolation cell. *Id*.

On the morning of December 28, 2020, at which time Lieutenant Alex Hawkins moved Poynter to general population Cell 524 for observation. *Id*. Cell 524 has 10 beds. [R. 95-3, Page ID # 480, Depo. of A. Bennett]. Jailer Bennett confirmed that Poynter had no keep-aways with any inmate in Cell 524 at the time he was transferred from the holding cell. *Id*. at 476.

Poynter's arrival in Cell 524 is documented on the video footage filed of record with the District Court. [R. 96, Video Footage] [R. 97, Page ID # 588, Receipt of Non-Electronic Document]. As the Court will observe, Poynter entered the cell,

3

dropped his mat and personal belongings, and immediately sought out another inmate in the cell – Scotty Wix (hereinafter "Wix"). *Id*. Other inmates in Cell 524 confirmed Poynter asked if Wix was in the cell once he entered and was looking to fight. [R. 95-6, Page ID # 535-39, Incident Report]. While the exact conversation between Poynter and Wix is unknown, Poynter is seen pointing his finger at Wix. [R. 96, Video Footage].

Eventually, after approximately one minute of back and forth, Poynter is attacked by Wix and a second inmate, Timothy Guess (hereinafter "Guess"). *Id*. The attack lasted approximately six seconds. *Id*. BCDC responded quickly to the incident – within eleven seconds – and removed Poynter for medical treatment. *Id*. Poynter was transferred to a Tennessee hospital for care and suffered a brain injury as a result of the attack. [R. 109, Page ID # 1042, Memo. Opinion & Order].

Cell 524 is equipped with a radio and camera for inmates to communicate with deputies or in the event of an emergency. [R.95-3, Page ID # 479, Depo. of A. Bennett]. Poynter never radioed, called, motioned, or yelled for assistance or to be removed from Cell 524 after discovering Wix and Guess were housed therein. [R. 96, Video Footage]. Plaintiff's own jail expert agreed that there is no evidence Poynter took action to notify BCDC his safety was allegedly at risk in Cell 524. [R. 95-7, Page ID # 553, Depo. of J. Eiser].

4

## II.

## PROCEDURAL BACKGROUND

On December 6, 2021, Poynter, by and through his guardian, Anita Fernandez, filed suit against Aaron Bennett, in his official capacity as Barren County Jailer, and Barren County, Kentucky.[1] [R. 1, Page ID # 1-7, Complaint]. Poynter's Complaint raised three theories as to how Barren County allegedly violated his rights by placing him in the cell with Wix and Guess: 1) Barren County failed to inform new inmates, such as Poynter, of the names of other inmates at BCDC so as to identify potential threats; 2) Barren County knew that Wix and Guess posed a frequent risk to inmate safety; and 3) Barren County knew that said risk was exacerbated by understaffing at BCDC, and therefore were deliberately indifferent to Poynter's safety in violation of his rights under Eighth and Fourteenth Amendments to the United States Constitution. *Id*. Poynter amended the Complaint on August 2, 2022. [R. 32, Page ID # 149-157, Amended Complaint].

After discovery had completed, on May 29, 2024, Barren County moved for summary judgment based upon Poynter's failure to carry the burden of proof on his Eighth Amendment/Fourteenth Amendment failure to protect claim under any of the aforementioned theories set forth in the Amended Complaint. [R. 95, Page ID # 433,

---

[1] Throughout his brief, Poynter concedes that his claim against Aaron Bennett, in his official capacity as Barren County Jailer, is duplicative of his claim against Barren County, Kentucky – therefore, they will be referred to herein collectively as Barren County.

5

MSJ].

On February 2, 2025, the District Court granted summary judgment to Barren County finding that Poynter failed to establish the elements required for a Fourteenth Amendment failure to protect claim, and further failed to establish that Barren County was liable for the alleged underlying constitutional violation under *Monell*. [R. 109, Page ID # 1044, Memo. Opinion & Order]. Relevant to this Petition are the District Court's decisions regarding: 1) the "substantial risk of harm" element of Poynter's underlying failure to protect claim; and 2) the "clear and consistent pattern of unconstitutional conduct" element required to connect to the alleged underlying constitutional violation to Barren County.

As set forth by the District Court, Poynter's Fourteenth Amendment failure to protect claim is analyzed under the following standard:

> [A]n officer violates the Fourteenth Amendment when (1) he acts intentionally 'with respect to the conditions under which the plaintiff was confined,' (2) those conditions 'put the plaintiff at substantial risk' of harm, (3) he does not take reasonable steps to abate that risk, and (4) by failing to do so he actually causes the plaintiff's injuries.

*Id*., at Page ID # 1047 (quoting *Reece v. Carey*, No. 22-5275, 2023 WL 3003191, at *4 (6th Cir. Apr. 19, 2023) (quoting *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 945 (6th Cir. 2022)).

The District Court appropriately found that Poynter failed to prove the substantial risk of harm element because he could not show that he was "personally

6

at substantial risk of assault." *Id.*, at Page ID # 1048 (citations omitted). The District Court relied upon the ruling set forth in *Davis v. Chorak*, No. 22-1839, WL 2487339 (6th Cir. Mar. 14, 2023)[2] (citing *Westmoreland v. Butler Cnty.*, 29 F.4th 721, 729 (6th Cir, 2022)). According to the District Court, "[t]he fact that Guess and Wix had fought with other inmates in the past and posed a general security risk is not enough to show substantial risk." *Id.*, citing *Davis*, 2023 WL 2487339, at *3 (citation omitted); *Lewis v. McClennan*, 7 F. App'x 373, 375 (6th Cir. 2001) ("Lewis has not alleged any specific facts which would show that he was in danger of being assaulted by the other inmates. At most, Lewis has alleged a hypothetical risk of danger to his safety prior to the attack.").

> The District Court went on to find as follows:
>
> Poynter testified that he was not afraid of Wix and denied any previous altercation with him. (Poynter Dep. 8:15-20). Poynter did not even know Guess. (Poynter Dep. 8:25-9:1). There is no evidence of prior animosity between Poynter and either Guess or Wix, and during booking, Poynter neither raised any concern about Guess or Wix, nor were those inmates on Poynter's keep-away list when Poynter was placed in Cell 524. (Pl.'s Mot. Summ. J. Ex. C, at 1; Bennett Dep. 101:11-13). Likewise, Plaintiff provides no evidence or argument that the nature of Poynter's criminal charge put him at a particular risk of co-inmate violence.

*Id.*, at Page ID # 1048-49.

---

[2] Copy provided herewith pursuant to FRAP 32.1 and 6 Cir. R. 32.1.

Furthermore, the District Court correctly held that, even when assuming Poynter could establish the necessary elements of a Fourteenth Amendment failure to protect claim, Poynter failed to prove the elements of a *Monell* custom of inaction connecting the alleged underlying constitutional violation to Barren County. *Id.*, at 1051. In particular, Poynter failed to prove "a clear and consistent pattern of constitutional conduct" which is the first element required for a custom of inaction as set forth in *Franklin v. Franklin Cnty.*, 115 F.4th 461, 472 (6th Cir. 2024) (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). *Id.* "The alleged pattern of unconstitutional conduct must be particularized, meaning that prior examples of wrongdoing must violate the same constitutional rights [as the plaintiff's] and violate them in the same way." *Id.*, at 1053., quoting *Franklin*, 115 F.4th at 472 (quotation marks omitted). The District Court properly held that there was no "evidence in the record to show that any other incidents of inmate-on-inmate violence had occurred in similar situations – i.e., because Guess or Wix had not been properly classified, or that Guess or Wix should not have been housed with the other inmate if properly classified." *Id.*, at 1054-55.

Poynter appealed the District Court's decision.

On December 17, 2025, a panel of the Sixth Circuit found that District Court "erred in holding that a reasonable trier of fact could not find that Poynter was at a substantial risk of harm from being placed in a cell with Guess and Wix, who both

8

had violent histories in BCDC." [Opinion, R. 22-2, Page ID # 17]. The panel relied upon the unpublished decision of *Schoonover v. Rogers*, No. 21-3970, 2022 WL 12258998, at *6 (6th Cir. Oct. 21, 2022), stating "'[t]his court has repeatedly observed that the risk of violent attack by fellow [incarcerated persons] known to have previously committed serious assaults, absent precautions, can create a substantial risk of serious harm." *Id*. The panel reasoned that the records of Wix and Guess at BCDC were lengthier than that of the inmate in *Young v. Campbell County*, F. App'x 314, 321 (6th Cir. 2021), and therefore their records were "sufficient to create a genuine issue of material fact as to whether Poynter was subject to a substantial risk of harm from being placed in a cell with them." The panel reached this conclusion despite plainly admitting "there is no evidence that Guess and Wix initiated an attack on other detained persons in cell 524 before Poynter." [Opinion, R. 22-2, Page ID # 18].

The panel further concluded that "Poynter presented evidence that would allow a trier of fact to find that there was a clear and persistent pattern of unconstitutional conduct." *Id*. at 20. The panel correctly cited the rule set forth in *Franklin* requiring that the alleged constitutional violations must violate the same constitutional right in the same way, but goes on to reach a decision that ignores this very rule requiring a pattern ***of unconstitutional conduct.*** *Id*. Specifically, the panel found that "Guess and Wix had collectively assaulted their cellmates eleven times

9

before they attacked Poynter[]" but were "continually placed in general-population cells where they assaulted others." *Id*. at 22. And because they were allegedly in general population cells when said attacks occurred – a fact that was not in the record, but rather gleaned by the panel's interpretation of the prior incident reports, a "reasonable trier of fact could therefore infer that the failure to reclassify Guess and Wix based on their violent behavior caused the assaults." *Id*. at 23.

As will be set forth below, the panel ignored the precedent of the Sixth Circuit and the Supreme Court of the United States in finding that Poynter sufficiently established proof upon which a jury could find in his favor. [Opinion, R. 22-2, Page ID # 17-18; 20-24].

## ARGUMENT

### I.

### THE ALLEGED SUBSTANTIAL RISK OF HARM WAS NOT PERSONAL TO POYNTER

The underlying constitutional violation alleged here is Barren County's failure to protect Poynter by ignoring its own classification policy in violation of Poynter's Fourteenth Amendment rights.

The second element is not present. There is no proof of a substantial risk of harm ***to Poynter***. *Davis*, No. 22-1839, 2023 WL 2487339, at *3. As the District Court stated, "[t]o satisfy this [second] element, Plaintiff had to present evidence that Poynter 'was personally at 'substantial risk of assault.'" [R. 109, Page ID #

10

1048], (quoting *Davis*, No. 22-1839, 2023 WL 2487339, at *3) (citing *Westmoreland*, 29 F.4th at 729). In *Davis*, this Court specifically held that while an inmate's "criminal history and prior behavioral problems created a general security risk," those allegations were insufficient to establish the plaintiff was "***personally*** at 'substantial risk of assault.'" No. 22-1839, 2023 WL 2487339, at *3 (emphasis added).

The reasoning applied in *Davis* should also apply here. The prior incident reports involving Wix and Guess are not proof of a substantial risk of harm to Poynter personally. None of them involved Poynter whatsoever. Poynter even admitted on Page 16, n. 14 of his Brief that the alleged harm was not personal to him.

> The County periodically focused below on whether Guess or Wix was a threat to Poynter specifically, and whether Poynter should have requested a "keep away" when he entered the jail. This misses the point. Guess and Wix's history of institutional violence was such that they posed a risk of harm to all other inmates, not just Poynter, and shouldn't have been housed in general population.

Poynter presented no evidence of prior animosity between him and either Guess or Wix. *Id*. Poynter did not raise any concern about Guess or Wix during his intake. *Id*. Neither inmate was listed on Poynter's keep-away list when Barren County placed him in Cell 524. *Id*. Poynter admitted he was not afraid of Wix and denied any previous altercations with him. *Id*. Poynter did not even know Guess. *Id*.

11

Poynter's own expert conceded that Barren County properly classified him for placement in the general population cell. *Id.*

The fact that Guess and Wix had fought with other inmates in the past and posed a general security risk is not enough to show a substantial risk of harm to Poynter. *Id.* Pursuant to *Davis*, this hypothetical, general, non-particularized risk of harm does not give rise to a constitutional violation. *Id.*; *Lewis*, 7 F. App'x at, 375. The panel's decision ignored this particularity requirement. And the cases upon which it relied (see above) in doing so are distinguishable.

*Schoonover* involved a plaintiff that was a sex offender who was attacked by another inmate named Waters due to him being a sex offender. 2022 U.S. App. LEXIS 29422, at *14. Said plaintiff had presented proof that sex offenders "were vulnerable to attack at the Jail from other inmates; one officer, fore instead, estimated during a deposition that half of the fights at the Jail would involve sex offenders[.]" *Id.* Additionally, there was proof that "sex offenders faced a particular risk of from Waters . . . as Waters had participated in several fights and previously attacked sex offenders, including one victim just days before the attack on Schoonover." *Id.* at *15. No such equivalent facts showing particularized risk of harm are present in this case.

In *Young*, prior to the subject attack, a sergeant at the jail had recommended that the attacker be reclassified due to multiple incidents with jail staff and other

12

inmates, but the reclassification never occurred. 846 Fed. Appx. 314, 318 (6th Cir. 2021). There is no evidence that a jail official, or even another inmate, at BCDC recommended Wix and/or Guess be reclassified and were subsequently ignored. Furthermore, in *Young*, there were interactions between the attacker and the plaintiff in the days leading up to the attack. The attacker stole items from the plaintiff. Poynter never had interactions with Wix or Guess at BCDC other than what was briefly captured on video footage.

The panel's cherry-picked quote from *Schoonover* and reliance on *Young* are misplaced. Those cases involved different circumstances to which the law applied differently. Contrarily, the District Court followed *Davis* in finding that Poynter could not prove the second element of his Fourteenth Amendment failure to protect claim, and that is what this Court should do here as merely alleging that another inmate had a violent history is not enough to show substantial risk of harm to that particular inmate.

## II.

### THE RECORD IS INSUFFICIENT TO ESTABLISH A CLEAR AND PERSISTENT PATTERN OF UNCONSTITUTIONAL CONDUCT

"[M]unicipal liability under section 1983 may only attach where the execution of a government's policy or custom . . . inflicts the injury complained of." *Little,* 103 Fed. Appx. at 900, quoting *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (internal quotation marks omitted).

13

A "custom" is a practice that, while not formally approved, "may fairly subject a [private prison] to liability on the theory that the relevant practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397*, 404 (1997). To succeed on a *Monell* claim for custom of inaction, as Poynter does here, there must be proof of the following:

> (1) the existence of a clear and persistent pattern of" unconstitutional conduct; (2) "notice or constructive notice" on the part of the municipality; (3) the municipality's "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) "that the [municipality's] custom was the 'moving force' or direct causal link in the constitutional deprivation."

*Franklin,* 115 F.4th at 472.

With regard to first element, the Sixth Circuit has stated that a plaintiff "cannot rely solely on a single instance to prove the existence of an unconstitutional custom." *Id*., quoting *Winkler v. Madison County*, 893 F.3d 877, 902 (6th Cir. 2018); *Stewart v. City of Memphis*, 788 F. App'x 341, 347 (6th Cir. 2019). Furthermore, "the similarity between a plaintiff's claim and an alleged pattern of constitutional violations 'must be particularized.'" *Id*., quoting *Berry v. Delaware Cnty, Sheriff's Off.*, 796 F. App'x 857, 862 (6th Cir. 2019). "What that means in practical terms is that "the prior examples of wrongdoing must violate the same constitutional rights [as the plaintiff's] and violate them in the same way." *Id.* (internal citations and quotation marks omitted). In *Franklin*, this required the plaintiff to prove "there was

14

a pattern of Eighth Amendment violations at the Jail (i.e., the same constitutional right that Price violated), that involved some sort of sexual assault on inmates (i.e., the right was violated in the same way as Franklin's was)." *Id*. at 473.

Applying the *Franklin* framework here, Poynter must establish a pattern of Fourteenth Amendment violations at BCDC (i.e., the same constitutional right he alleges Barren County violated), that involved some sort of assault on inmates (i.e., the right was violated in the same way Poynter alleges his was). *Id*. Poynter did provide proof of prior incidents at BCDC involving his attackers. Poynter did not establish that those incidents violated other inmates' Fourteenth Amendment rights. This is where is the panel got it wrong and failed to follow the established precedent of the Sixth Circuit and Supreme Court of the United States.

Yes, Poynter did produce incident reports of Wix and Guess being involved in prior altercations at the jail (some of which did not involve violence or aggressive behavior by Wix or Guess and some of which are from years before the incident involving Poynter). That is not disputed. However, the sheer number of prior incidents involving Wix and Guess does not automatically equate to proof of a "widespread, permanent, and well-settled custom" of Barren County recklessly disregarding its classification of inmates.

As the District Court held, Poynter "has not identified any evidence in the record to show that any other incidents of inmate-on-inmate violence had occurred

15

in similar situations—i.e., because Guess or Wix had not been properly classified, or that the Guess or Wix should not have been housed with the other inmate if properly classified." [R. 109, Page ID # 1055, Memo. Opinion & Order]. The prior incidents involving Guess and Wix certainly could have occurred without any constitutional violation by Barren County; in fact there is no evidence to the contrary whatsoever. It simply cannot be assumed that every time one inmate assaults another, the governmental entity having custody of those inmates has committed a constitutional violation. Yet, that is the exact assumption the Court made here. There must be evidence of a clear and persistent pattern ___of similar prior constitutional violations___, it does not exist here.

Poynter presented no evidence of Guess and Wix's prior classification designations at the time of the prior incidents. Poynter presented no evidence of the circumstances at BCDC when those classifications were made or when the incidents occurred. Poynter presented no evidence that Guess and Wix were classified improperly during each incident because BCDC ignored its classification policy. Poynter presented no evidence of similar Fourteenth Amendment violations associated with Guess and Wix's prior incidents. How then can it be said that the prior incident reports are sufficient for a jury to find a clear and persistent pattern of constitutional violations?

16

The panel's application of the rule set forth in *Franklin* was wrong. It loosely construed the requirement of similar prior constitutional violations. Guess and Wix having a record of prior incidents while supposedly placed in general population cells does not mean those prior incidents were the result of or resulted in violations of the other inmates' Fourteenth Amendments rights. Nor does it establish that Barren County was responsible for any theoretical violation, as is plainly required pursuant to *Franklin*. The panel focused on numbers instead of substance to reach the result it intended, even though the required proof is absent. There is not a tenable connection between the prior incidents and what happened to Poynter without evidence of prior Fourteenth Amendment violations resulting from those incidents placing Barren County on notice of same. The panel's decision glosses over this fundamental requirement.

## CONCLUSION

The panel ignored the precedent of this Court and the Supreme Court regarding Fourteenth Amendment *Monell* claims involving a custom of inaction. For the reasons set forth above, the Court should grant a panel rehearing and affirm the District Court's grant of summary judgment to Barren County.

/s/ Aaron D. Smith
Aaron D. Smith
John A. Sowell
English, Lucas, Priest & Owsley, LLP
1101 College Street; P.O. Box 770
Bowling Green, Kentucky 42102

17

**CERTIFICATE OF COMPLIANCE**

The author of this Brief hereby certifies in accordance with FED. R. APP. P. 32(a)((7)(B) and FED. R. APP. P. 32(f) that this Brief contains 3,893 words exclusive of the Cover Page, the Table of Contents, the Table of Citations, Rule 40 Statement, Certificates of Counsel, the Signature Block, and the Certificate of Service, according to the word processing program used to produce it.

**CERTIFICATE OF SERVICE**

I hereby certify that true and correct copies of Appellees' Brief has been filed utilizing the Court's CM/ECF system and sent to Hon. William M. Butler, Jr., 500 West Jefferson Street, Suite 1520, Louisville, KY 40202, wmb@kycriminallawyer.com, by electronic mail this 30st day of December, 2025.

*/s/ Aaron D. Smith*
Aaron D. Smith

**APPENDIX**

Panel Opinion, *Poynter v. Barren County*, No. 25-5188, R. 22-2 ...............Exhibit 1

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| Kelly L. Stephens<br>Clerk | 100 EAST FIFTH STREET, ROOM 540<br>POTTER STEWART U.S. COURTHOUSE<br>CINCINNATI, OHIO 45202-3988 | Tel. (513) 564-7000<br>www.ca6.uscourts.gov |

Filed:  December 17, 2025

Mr. William M. Butler Jr.
500 W. Jefferson Street
Suite 1520
Louisville, KY 40202

Mr. Aaron David Smith
Mr. John A. Sowell
English, Lucas, Priest & Owsley
1101 College Street
Bowling Green, KY 42102

Re:     Case No. 25-5188, *Luther Poynter v. Aaron Bennett, et al*
        Originating Case No. 1:21-cv-00162

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Mr. James J. Vilt Jr.

Enclosures

Mandate to issue.

EXHIBIT 1

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0345p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

LUTHER POYNTER, by and through his guardian, Anita
Fernandez,

    *Plaintiff-Appellant*,

  *v.*

AARON BENNETT, in his official capacity as Barren
County Jailer; BARREN COUNTY, KENTUCKY,

    *Defendant-Appellee*.

No. 25-5188

---

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 1:21-cv-00162—Gregory N. Stivers, District Judge.

Argued:  October 21, 2025

Decided and Filed:  December 17, 2025

Before:  MOORE, CLAY, and WHITE, Circuit Judges.

---

**COUNSEL**

**ARGUED:**  William M. Butler, Jr., Louisville, Kentucky, for Appellant.  Aaron D. Smith, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellees.  **ON BRIEF:**  William M. Butler, Jr., Louisville, Kentucky, for Appellant.  Aaron D. Smith, John A. Sowell, ENGLISH, LUCAS, PRIEST & OWSLEY, LLP, Bowling Green, Kentucky, for Appellees.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   Luther Poynter was incarcerated in the Barren County Detention Center ("BCDC") on December 25, 2020, for contempt of court due to his failure to pay child support.  On December 28, BCDC moved Poynter to a general-population cell, where Scotty Wix and Timothy Guess were also housed.  Within one minute and thirty seconds of Poynter entering the cell, Guess and Wix attacked him, punching him repeatedly in the head.  Poynter suffered a traumatic brain injury from the assault and is permanently impaired.  Collectively, Wix and Guess had assaulted other detained persons in their cells in BCDC eleven times before they attacked Poynter, but BCDC nevertheless continued to house them in general-population cells.

Poynter, by and through his guardian and sister, Anita Fernandez, sued Aaron Bennett, in his official capacity as Barren County Jailer, and Barren County under 42 U.S.C. § 1983, alleging that they violated his rights under the Due Process Clause of the Fourteenth Amendment because they were deliberately indifferent to his safety.  Following discovery, Bennett and Barren County moved for summary judgment, arguing that Poynter failed to show that he suffered a constitutional violation.  The district court granted summary judgment, holding that Poynter failed to show that his constitutional rights were violated or that Barren County was liable for the violation.  Poynter timely appealed.  For the reasons that follow, we **REVERSE** the district court's summary-judgment ruling and **REMAND** for further proceedings consistent with this opinion**.**

## I. BACKGROUND

### A.  Facts

BCDC is a medium-sized jail that housed approximately 220 detained persons in 2020.  R. 100-4 (Sweeney Dep. at 101:15–18) (Page ID #785).  County and state detainees were housed

No. 25-5188                     *Poynter v. Bennett et al.*                     Page 3

together in BCDC.  *See* R. 95-5 (Boston Dep. at 34:16–18) (Page ID #524).[1]  Luther Poynter was taken to BCDC on December 25, 2020, after he was arrested for contempt of court for his failure to pay child support.  R. 95-2 (Facility Admission Report) (Page ID #451); R. 100-2 (Fernandez Dep. at 33:14–18) (Page ID #714).  Poynter was initially placed in a cell for COVID-19 observation.  R. 95-3 (Bennett Dep. at 86:3–14) (Page ID #474).  On December 28, BCDC moved him to general-population cell 524, which housed other detainees who were recently admitted to the jail and had already completed the COVID-19 observation period.  *Id.* at 86:3–95:22, 111:1–6 (Page ID #474–76, 480).  Scotty Wix and Timothy Guess were already housed in that cell.  R. 101-2 (12/28/2020 Incident Report at 1) (Page ID #890); Video Footage at 0:00–1:30.

Poynter entered cell 524, began talking to some of the other detained persons, and pointed at one of them.  Video Footage at 0:00–00:25.  Poynter then sat down on a bench and continued talking to people.  *Id.* at 00:25–01:19.  In less than a minute and thirty seconds, while Poynter remained seated, Guess and Wix attacked him, punching him repeatedly in the head.  *Id.* at 01:20–01:25.  Poynter then fell to the floor.  *Id.* at 01:25–1:30.  BCDC staff entered the cell shortly after the attack.  *Id.* at 01:38.  Poynter suffered a traumatic brain injury and needed an emergency craniotomy.  R. 100-2 (Fernandez Dep. at 65:2–68:10) (Page ID #722).  His nose and cheekbone were fractured, and he required facial-reconstruction surgery.  *Id.*  He is now partially paralyzed on his right side, struggles with his short-term memory, uses a wheelchair, and lives in an assisted-living facility.  *Id.* at 7:23–8:25, 65:2–68:10 (Page ID #707, 722).[2]

BCDC's incident report on the assault states that unnamed detainees in cell 524 told BCDC staff that Poynter was "looking for trouble" with Wix when he entered the cell because of a dispute over drugs.  R. 101-2 (12/28/2020 Incident Report at 2) (Page ID #891).  The video

---

[1] "County" detainees include both pretrial detainees and incarcerated persons convicted of misdemeanors. "State" detainees are incarcerated persons who have been convicted of felonies but have been assigned to serve their sentences in local jails.  Appellant Br. at 8–9; R. 95-3 (Bennett Dep. at 69:1–4) (Page ID #469) (testifying that once an inmate is sentenced, he becomes a state inmate.)

[2] Wix and Guess were sentenced to ten and seventeen years in prison respectively for their assault of Poynter.  *See* Offender Information: Scotty Wix, KY. ONLINE OFFENDER LOOKUP, http://kool.corrections.ky.gov/KOOL/Details/36513; Offender Information: Timothy Guess, KY. ONLINE OFFENDER LOOKUP, http://apps.corrections.ky.gov/KOOL/Details/256769.

footage of the attack does not have audio, so it sheds no light on what Poynter said to the other detained persons before he was attacked. BCDC characterizes Poynter's body language prior to the assault as aggressive, Appellee Br. at 5, but Poynter's expert disagrees, R. 95-7 (Eiser Dep. at 42:3–16) (Page ID #552). And BCDC's expert also acknowledged that, at certain points in the video, Poynter did not appear to be worried for his safety, nor to be looking for a fight. R. 100-4 (Sweeney Dep. at 33:2–36:9) (Page ID #768–69). Based on the video footage, it is entirely clear that Poynter did not physically instigate the attack because he remained seated and did not move towards Guess or Wix before he was assaulted. Video Footage at 1:00–1:25. It is not clear, however, whether Poynter was being confrontational, and this is the type of question we would normally leave for a trier of fact.

Wix and Guess were "frequent fli[ers]" in BCDC, R. 100-5 (Hawkins Dep. at 27:8–25) (Page ID #819), and both had extensive histories of violence in the jail, which are reflected in incident reports in their files in BCDC's information system, JailTracker. Guess's incident reports show that he resisted staff commands and was combative with staff on several occasions. Once, Guess was so combative that BCDC staff had to take him "down to the floor," after which he continued to "fight[]" with the deputies. R. 101-2 (2/7/2007 Incident Report) (Page ID #856). Several years later, when he was being booked into BCDC again, Guess refused to comply with orders and was sprayed with "OC," also known as pepper spray. R. 101-2 (1/23/2010 Incident Report) (Page ID #858).

On another occasion, Guess kicked his cell door repeatedly, screamed at and threatened BCDC staff, and threw wet toilet paper over the camera in his cell. R. 101-2 (11/4/2019 Incident Report) (Page ID #872–73). This behavior led to BCDC staff drawing their tasers and placing him in restraints. *Id.* Less than a month before he assaulted Poynter, Guess again repeatedly kicked the door of his cell and "covered the camera with a piece of his orange jumpsuit that he had bitten off," prompting BCDC to move him into another cell. R. 101-2 (12/10/2020 Incident Report) (Page ID #876). After he was moved, Guess hit the panic button and "beat[]" the windows and doors of the cell, leading BCDC staff to physically restrain him again. *Id.* BCDC staff believed Guess was showing signs of drug use during the incident. *Id.*

No. 25-5188                     *Poynter v. Bennett et al.*                     Page 5

Guess also had a history of assaulting other detained persons in his cell. On one occasion, someone reported Guess assaulted him in their cell while he was sleeping. R. 101-2 (5/19/2008 Incident Report) (Page ID #857). In 2012, after BCDC staff caught Guess and another detained person smoking, Guess punched the other detained person in the face in front of BCDC staff and stated, "I was going to get you tonight anyways mother fucker." R. 101-2 (12/26/2012 Incident Report) (Page ID #860). In May 2019, after BCDC staff placed another detained person in Guess's cell, Guess immediately "stood up, took off his shirt and attacked" him. R. 101-2 (5/4/2019 Incident Report) (Page ID #863). In another May 2019 incident, Guess and Wix assaulted another detained person together. Guess and Wix both hit the other person and Guess then put him in a "choke hold" while Wix "beat him in the ribs." R. 101-2 (5/11/2019 Incident Report) (Page ID #864). After releasing him from the choke hold, Guess "dropped" the detained person "against the door and began kicking him." *Id.* On another occasion, in September 2019, Guess walked up to another detained person and punched him in the face, leading to a fight. R. 101-2 (9/3/2019 Incident Report) (Page ID #866). In 2020, Guess hit another detained person in the head. R. 101-2 (1/24/2020 Incident Report) (Page ID #874).

On several occasions Guess threatened others. The police notified BCDC that Guess was placing threatening calls to people outside of the facility in 2012. R. 101-2 (12/1/2011 Incident Report) (Page ID #859). In 2018, BCDC staff found notes in Guess's cell that they believed he had written that threatened to attack another detained person. R. 101-2 (10/01/2018 Incident Report) (Page ID #862). In 2019, Guess grabbed another detained person's bed roll, threw it at him, and yelled at him to either "kick the door" or "fight" him. R. 101-2 (7/6/2019 Incident Report) (Page ID #865). Finally, in 2020 Guess had to be removed from the kitchen-work detail after he wrote a note threatening another detained person. R. 101-2 (7/7/2020 Incident Report) (Page ID #875).

Guess also got into fights[3] with other detained persons in his cell twice. R. 101-2 (8/26/2018 Incident Report) (Page ID #861); R. 101-2 (10/7/2019 Incident Report) (Page ID #870). During one of those fights in October 2019, BCDC staff had to physically pull Guess off

---

[3]We categorize these incidents as fights and not assaults because the incident reports do not make it clear whether Guess initiated them.

the other person to stop the fight. R. 101-2 (10/7/2019 Incident Report) (Page ID #870). Guess also tested positive for methamphetamine and amphetamines while in BCDC, R. 101-2 (9/4/2019 Incident Report) (Page ID #867), and was involved in several verbal altercations with other detained persons. R. 101-2 (9/11/2019 Incident Report) (Page ID #868); R. 101-2 (12/19/2020 Incident Report) (Page ID #877). One of the verbal altercations took place in cell 524 only eight days before Poynter's assault and resulted in a keep-apart order being entered for Guess and the other person. R. 101-2 (12/19/2020 Incident Report) (Page ID #877).[4]

Wix had a similar history of violence in BCDC. On one occasion, after a BCDC staff member gave Wix an order, Wix responded "fuck this" and charged toward him with both fists raised with the "intent to become combative." R. 101-2 (9/28/2010 Incident Report) (Page ID #881). Wix also assaulted his cellmates on several occasions. Wix and a second detained person "jump[ed]" another person in their cell in 2013. R. 101-2 (12/27/2013 Incident Report) (Page ID #884). In 2014, Wix punched his cellmate in the face. R. 101-2 (2/15/2014 Incident Report) (Page ID #885). On another occasion, within approximately one minute of a detained person being placed in Wix's cell, Wix struck him in the face and then fought with him. R. 101-2 (7/19/2017 Incident Report) (Page ID #886). And as previously discussed, in 2019 Wix and Guess attacked another detained person together—Wix punched the victim in the face and beat him in the ribs. R. 101-2 (5/11/2019 Incident Report) (Page ID #887). In 2020, Wix "swung" at another detained person and then fought with him. R. 101-2 (2/15/2020 Incident Report) (Page ID #888).[5] In October 2020, Wix became involved in a fight in cell 524 after a fight broke out between two other detained persons.[6] Once the fight had seemingly ended, Wix punched one of the other detained persons and then fought with him until BCDC staff arrived. R. 101-2 (10/14/2020 Incident Report) (Page ID #889).

---

[4]A "keep-apart" or "keep-away" order reflects that those two specific detained persons had a history that required them to be separated from each other. R. 95-3 (Bennett Dep. at 74:25–76:1) (Page ID #471); R. 95-5 (Boston Dep. at 31:15–24) (Page ID #523).

[5]There is an additional incident in Wix's file. In 2010, one of Wix's cellmates was assaulted, but it is unclear whether Wix committed the assault. R. 101-2 (12/10/2010 Incident Report) (Page ID #882). Therefore, we do not consider this incident report in our analysis.

[6]We categorize this as a fight rather than an assault because, at least initially, Wix did not initiate the physical conflict.

Poynter's expert testified that, given Wix's and Guess's histories of violence, they posed a threat to others and should not have been housed in general population. R. 95-7 (Eiser Dep. at 37:1–39:20, 51:8–20) (Page ID #550–51, 554). Poynter argues that BCDC's failure to classify Wix and Guess properly and to remove them from general population resulted from BCDC's customs of not considering detained persons' institutional histories of violence when conducting the classification analysis and not classifying state detainees housed there at all, in violation of its own written policy and Kentucky state regulations.

Classification is a form of risk assessment used to keep detained persons and jail staff safe. R. 95-3 (Bennett Dep. at 137:1–5) (Page ID #486); R. 100-4 (Sweeney Dep. at 23:11–25:22) (Page ID #766). Correctly classifying detained persons is essential for safety and minimizing the risk of violence to staff and other detainees. R. 95-7 (Eiser Dep. at 29:1–18) (Page ID #548). Under Kentucky Administrative Regulation 501.3 ("KAR 501.3"), "[e]ach jail shall develop a prisoner classification system, which shall be included in the facility's written policy and procedure manual." R. 101-4 (KAR 501.3 at 1) (Page ID #900). "The prisoner classification system shall provide for separation" of prisoners "with a tendency to harm others, be harmed by others, or requiring administrative segregation." *Id*. And the criteria used in inmate classification shall include the "seriousness of current offense" and "institutional behavioral history," among other things. *Id*.

According to official BCDC policy, which tracks KAR 501.3's language and requirements, each detained person must be classified based on their behavioral history at BCDC, among other factors, when they were initially booked into the jail and on a continuing basis as necessary based on factors including "[d]ay-to-day behavior as observed by jail staff" and disciplinary action. *See* R. 101-1 (BCDC Classification Policy at 1–2) (Page ID #854–55). Additionally, each detained person must be assigned a classification level of either maximum security, medium security, minimum security, or protective custody/administrative segregation. *Id.* at 1 (Page ID #854).

Poynter, however, has presented evidence that BCDC did not follow its written policy and that, in practice, it did not consider institutional behavioral history at all when classifying detained persons unless they had an active "keep apart" from another individual who was also

currently detained in BCDC, which would result simply in the two persons subject to the order being separated from each other. *See* R. 95-5 (Boston Dep. at 25:4–8, 33:3–23) (Page ID #522, 524). Poynter's expert testified that considering institutional behavior is the "biggest" component of the classification analysis, R. 95-7 (Eiser Dep. at 30:21–24) (Page ID #549), and BCDC's expert agreed that institutional behavior should be considered in determining whether a detained person has a tendency to harm others, R. 100-4 (Sweeney Dep. at 30:2–12) (Page ID #768).

Poynter additionally provided evidence that BCDC classified county detainees only as male or female, adult or juvenile, sentenced or pending sentencing, and violent or nonviolent, and not as minimum, medium, or maximum security. R. 95-5 (Boston Dep. at 20:14–25:3, 40:24–41:1) (Page ID #520–22, 525–26). County detainees were classified as violent or nonviolent based only on their charges and their behavior during their arrest and booking. *Id.* at 25:4–13 (Page ID #522).

There is also evidence that BCDC did not classify state detainees at all or consider their institutional history. Instead, BCDC relied on the state Department of Corrections to classify state detainees. R. 100-5 (Hawkins Dep. at 19:11–20:13) (Page ID #817); R. 100-6 (Smith Dep. at 40:17–20) (Page ID #837); R. 95-5 (Boston Dep. at 27:21–28:6) (Page ID #522). Poynter cites testimony that suggests that the state Department of Corrections' classifications were meant to designate where a detained person could be assigned work duty rather than where they should be housed. *See* R. 100-5 (Hawkins Dep. at 11:6–8) (Page ID #815); R. 95-3 (Bennett Dep. at 62:17–24) (Page ID #468).

Wix and Guess were state detainees when they attacked Poynter. R. 95-3 (Bennett Dep. at 32:16–33:16) (Page ID #460). BCDC cites nothing in the record that shows that Guess and Wix were ever classified or reclassified by BCDC, other than general testimony that all detained persons' classifications were constantly evolving and took institutional history into consideration. *See* Appellee Br. at 25–26 (citing R. 95-3 (Bennett Dep. at 62:19–65:23, 116:13–17) (Page ID #468, 481) and R. 100-5 (Hawkins Dep.) (Page ID #818)). BCDC's expert testified that if BCDC had made a classification determination that Guess or Wix were a threat to others and could not be housed in general-population cells on a more permanent or continuing basis,

that determination should have been documented. R. 100-4 (Sweeney Dep. at 104:24–105:21) (Page ID #786). BCDC was unable to produce documents showing that Guess and Wix were ever classified or reclassified by BCDC, or that BCDC conducted a classification analysis for them, despite Poynter's request that the County produce such documents. R. 95-7 (Eiser Dep. at 54:18–55:3, 60:22–24, 67:9–68:16) (Page ID #555, 556, 558). Poynter's expert testified that the lack of documentation contributed to his conclusion that BCDC did not follow its classification policy or conduct proper classification analyses, implying that such determinations and analyses generally would have been documented by jails if they occurred. *Id.* at 61:1–3 (Page ID #556).

Against the evidence Poynter presented, BCDC cites testimony that suggests it did in fact follow its written classification policy, including considering institutional behavioral history, and would reclassify state-detained persons on a continuing basis in light of their behavior once they were in BCDC. *See* R. 95-3 (Bennett Dep. at 22:24–25:18, 62:19–65:23, 116:13–17) (Page ID #458, 468, 481). BCDC's expert also testified that Guess, Wix, and Poynter should have all been in the same classification category despite Wix's and Guess's histories of violence. R. 100-4 (Sweeney Dep. at 93:19–25) (Page ID #783). Additionally, BCDC's expert testified that the jail did not ignore prior institutional history because "the record shows that there was disciplinary action taken" in response to Guess's and Wix's reported incidents. *Id.* at 103:18–23 (Page ID #786).

## B. Procedural History

Poynter, by and through his guardian and sister, Anita Fernandez, sued Aaron Bennett, in his official capacity as Barren County Jailer, and Barren County[7] under 42 U.S.C. § 1983, alleging violations of his Eighth and Fourteenth Amendment rights because of their deliberate indifference to his safety. *See* R. 32 (Am. Compl.) (Page ID #149–57). Following discovery, Bennett and Barren County moved for summary judgment, arguing that Poynter failed to show his constitutional rights were violated because there was insufficient evidence that Poynter was put at a substantial risk of harm. R. 95-1 (Mot. for Summ. J. at 10–15) (Page ID #444–49).

---

[7]Barren County and BCDC are used interchangeably in this opinion because the parties do not dispute that Barren County is liable for BCDC's actions.

No. 25-5188             *Poynter v. Bennett et al.*             Page 10

Additionally, they argued that a suit against Bennett in his official capacity was, in effect, a suit against the municipality. *Id.* at 5 (Page ID #439). Poynter agreed that the County is the only defendant in this case and abandoned his claims related to understaffing and providing a list of current detained persons to new detainees during the booking process, but Poynter argued that BCDC's custom of failing to classify state detainees and consider detained persons' institutional histories in the classification analysis caused his injuries and violated the Due Process Clause of the Fourteenth Amendment. R. 103 (Opp'n to Mot. for Summ. J. at 3 n.5, 12–20, 21 n.20) (Page ID #971, 981–88, 989).

The district court granted summary judgment for Barren County, concluding that Poynter failed to show that BCDC violated his Fourteenth Amendment rights. The district court held that, in analyzing Poynter's claims, it was required to "assess the individual actions of the BCDC staff member involved with the alleged violation." *Poynter v. Bennett*, No. 1:21-CV-00162-GNS-HBB, 2025 WL 606183, at *4 & n.4 (W.D. Ky. Feb. 25, 2025). Because there was no evidence as to which staff member classified Wix and Guess, the court assessed only whether a staff member intentionally misclassified Poynter and found that the individual officer's failure "to follow the BCDC classification policy by itself . . . [was] insufficient to prove that he intentionally exposed Poynter to harm." *Id.* at *4. Next, the district court held that Poynter failed to show he was at a substantial risk of harm from being placed in the cell with Wix and Guess because "[t]he fact that Guess and Wix had fought with other inmates in the past and posed a general security risk is not enough to show substantial risk." *Id.* at *5. The district court determined that because Poynter was properly classified and did not have a keep-apart order from Wix or Guess he "failed to prove that reasonable steps were not taken to abate a known risk to Poynter." *Id.*

The district court next held that the municipality was not liable for the alleged constitutional violation because Poynter failed to show that an individual defendant violated his constitutional rights. *Id.* Despite this conclusion, the court conducted a partial *Monell* analysis. *Id.* at *5–10. The court found that there was not a pattern of similar constitutional violations because Poynter did "not identif[y] any evidence in the record to show that any other incidents of inmate-on-inmate violence had occurred in similar situations—i.e., because Guess or Wix had

not been properly classified, or that the [sic] Guess or Wix should not have been housed with the other inmate if properly classified." *Id.* at *8. Next, the court concluded that the County did not have actual or constructive notice of the unconstitutional conduct because the court believed "[t]he fact that Guess and Wix had been in fights with other inmates alone" was insufficient to "show that Barren County had actual or constructive notice that BCDC staff was failing to classify inmates, or that there was any connection between failures to classify inmates and incidents of inmate-on-inmate violence at the BCDC." *Id.* Finally, the court held that Poynter failed to show that BCDC was deliberately indifferent to his constitutional rights because its written classification policy was adequate. *Id.* at *9. Poynter timely appealed. R. 111 (Notice of Appeal) (Page ID #1062).

## II. ANALYSIS

We review de novo a district court's grant of summary judgment. *Franklin v. Franklin County*, 115 F.4th 461, 469 (6th Cir. 2024). The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 470 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "A genuine dispute of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). Summary judgment is proper if, when drawing all inferences in the light most favorable to the non-moving party, the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Franklin*, 115 F.4th at 469–70 (quoting Fed. R. Civ. P. 56(a)).

A municipality can be held liable for a constitutional violation under § 1983 if the plaintiff demonstrates that the violation occurred "because of a municipal policy or custom." *Id.* at 470 (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)). This is often referred to as *Monell* liability, or a *Monell* claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A custom is a practice "that has not been formally approved" but "is so widespread as to have the force of law." *Ford v. County of Grand Traverse*, 535 F.3d 483, 495–96 (6th Cir. 2008) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)).

No. 25-5188                    *Poynter v. Bennett et al.*                    Page 12

## A. Expansion of Claims

BCDC argues that Poynter's amended complaint did not sufficiently allege the *Monell* theory based on BCDC's custom of failing to classify detainees that he advanced in opposition to BCDC's summary-judgment motion. Appellee Br. at 7–9. This argument is not persuasive. We have held that a plaintiff may not unfairly expand their claims in response to a motion for summary judgment. *See Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). To determine if the plaintiff is attempting to do so, "courts consider whether the allegedly new claim causes 'unfair surprise' to the defendant." *Grinnell v. City of Taylor*, No. 21-2748, 2022 WL 1562291, at \*5 (6th Cir. May 18, 2022) (quoting *Tucker*, 407 F.3d at 788). Importantly, "a complaint need not expressly plead legal theories; it need only 'plead factual allegations that impliedly establish[] at least one viable theory.'" *Lunneen v. Village of Berrien Springs*, Nos. 22-2044; 22-2046, 2023 WL 6162876, at \*13 (6th Cir. Sep. 21, 2023) (alteration in original) (quoting *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1160 (6th Cir. 2021)). The amended complaint did so here.

The amended complaint alleges that BCDC violated Poynter's Fourteenth Amendment right to be free of "Cruel and Unusual Punishment" by being "deliberate[ly] indifferen[t]" to his "safety." R. 32 (Am. Compl. ¶¶ 36, 39) (Page ID #155). The amended complaint further alleges that Wix and Guess were in "general population" even though Wix and Guess had long histories of violence in BCDC and because of those histories "BCDC and Jailer Bennett . . . knew that Wix and Guess posed a frequent risk to inmate safety." *Id.* ¶¶ 23–27 (Page ID #152–53). The complaint also alleged that BCDC "kn[e]w that . . . the lack of an adequate inmate classification system[] render[ed] [it] largely unable to prepare for or prevent inmate-on-inmate violence" and that "[t]he . . . County also kn[e]w that Wix and Guess pose[d] a risk of violence to inmates placed into the general population with them." *Id.* ¶¶ 30–31 (Page ID #154); *see also* ¶¶ 12, 23 (Page ID #151, 152). Finally, the complaint alleges that it was the "County's policy and practice of allowing Wix and Guess to freely roam [BCDC's] general population area" that constituted deliberate indifference and led to Poynter's injuries. *Id.* ¶¶ 33, 40 (Page ID #154, 156). These "factual allegations . . . support the . . . basis for" the theory of Poynter's *Monell* claim, and therefore BCDC "w[as] not subject to unfair surprise" when Poynter raised this argument in

response to its motion for summary judgment. *Lunneen*, 2023 WL 6162876, at \*13; *see also* *Grinnell*, 2022 WL 1562291, at \*5.

## B.  Constitutional Violation

Before delving into whether Poynter has shown his constitutional rights were violated, we address one overarching point.  The district court held that it was required to determine whether an individual BCDC staff member committed a constitutional violation, because "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Poynter*, 2025 WL 606183, at \*5 (quoting *Westmoreland v. Butler County*, 29 F.4th 721, 731 (6th Cir. 2022)).  That is incorrect—we have held that a municipality can be liable for a constitutional violation "even in the absence of a showing of a constitutional violation by any one individual." *Grote v. Kenton County*, 85 F.4th 397, 414 (6th Cir. 2023).  In many cases the lack of a constitutional violation committed by an individual will mean there was in fact no constitutional violation.  But if a "constitutional harm" was nevertheless "inflicted" on the victim, for example, through the collective actions of several individuals, the municipality can still be held liable. *Id.* (citation modified).  Therefore, Poynter was not required to establish that a specific individual violated his rights.  Instead, he was required to demonstrate only that he suffered a constitutional harm.

Poynter has presented evidence that would allow a trier of fact to find his constitutional rights were violated.  We begin the analysis of his claim with some necessary background on its constitutional basis.  The Eighth Amendment protects incarcerated persons from "cruel and unusual punishments."  U.S. Const. amend. VIII.  Prisons have "a duty . . . to protect [incarcerated persons] from violence at the hands of other [incarcerated persons]." *Westmoreland*, 29 F.4th at 726 (first alteration in original) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)).  An incarcerated person's constitutional rights are violated if the prison is "deliberate[ly] indifferen[t] to [their] health or safety." *Id.* (first two alterations in original) (quoting *Farmer*, 511 U.S. at 833).  Pretrial and civil detainees' claims for deliberate indifference, however, "derive . . . from the Fourteenth Amendment," and "not from the Eighth Amendment, with its focus on punishment." *Grote*, 85 F.4th at 405; *see also Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018) ("[T]he Supreme Court long ago 't[ook] the position

that the Eighth Amendment is inapplicable to [a civil contempt] sentence.'" (second and third alteration in original) (quoting *United States v. Dien*, 598 F.2d 743, 745 (2d Cir. 1979) (per curiam))). "The Due Process Clause of the Fourteenth Amendment provides the same protections" as the Eighth Amendment. *Westmoreland*, 29 F.4th at 727.[8]

Claims for deliberate indifference under the Eighth and Fourteenth Amendments are similar in many respects, and "'historically [we] analyzed'" them entirely "'under the same rubric.'" *Brawner v. Scott County*, 14 F.4th 585, 591 (6th Cir. 2021) (quoting *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018), *abrogated on other grounds by*, *Brawner*, 14 F.4th at 591–96). Recently, however, we held in *Brawner* that there is an important difference between the two—plaintiffs bringing a Fourteenth Amendment claim are not required to show subjective knowledge, while plaintiffs bringing an Eighth Amendment claim are. *Id.* at 591–96; *Westmoreland*, 29 F.4th at 726. Under *Brawner*, a plaintiff asserting a Fourteenth Amendment

---

[8]The district court and both parties before this court proceeded on the premise that the Fourteenth Amendment governs Poynter's claim. Appellee Br. at 17–23; Appellant Br. at 29; *Poynter*, 2025 WL 606183, at *3–4. BCDC does not argue that Poynter's claims should be evaluated under the Eighth Amendment. Appellee Br. at 17–23. We note that whether Poynter was arrested for civil or criminal contempt is not entirely clear from the record before us, but there is at least some suggestion that it was civil. In depositions, attorneys stated that the contempt order was civil, R. 100-2 (Fernandez Dep. at 33:11–18) (Page ID #714), and that Poynter was not charged with a criminal offense, R. 100-4 (Sweeney Dep. at 91:1–7) (Page ID #783). Additionally, BCDC classified Poynter as pending sentencing when he was booked in BCDC, rather than as already sentenced. The pending sentencing classification was used to signify that a detainee had not yet been sentenced for their criminal offense, and the sentenced classification reflected that the incarcerated person had already been convicted and sentenced for their crime. R. 95-3 (Bennett Dep. at 71:13–15) (Page ID #470); R. 95-5 (Boston Dep. at 23:24–24:3) (Page ID #521). Had Poynter's contempt been criminal in nature, one would assume that he would have been classified as already having been sentenced for a crime, because "'[c]riminal contempt is a crime in the ordinary sense.'" *Hopper*, 887 F.3d at 752 (alteration in original) (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994)). Additionally, criminal contempt orders generally impose a definite sentence without any possibility of early release—in fact, courts use that feature as a key indicator that contempt is criminal in nature. *Id.* The distinction between civil and criminal contempt may well matter, had BCDC raised it, because if Poynter was convicted of criminal contempt that could impact whether the Eighth Amendment or the Fourteenth Amendment governs his claim. *See id.* at 752–54. Despite this, BCDC did not argue that Poynter was convicted of criminal contempt or that the Eighth Amendment should apply, which forfeits the issue, so we follow the parties' lead and analyze this case under the Fourteenth Amendment. *See Hehrer v. County of Clinton*, No. 24-2016, ---F.4th---, 2025 WL 3564162, at *4 (6th Cir. Dec. 12, 2025) (analyzing the plaintiff's claim under the Fourteenth Amendment when no party argued that the court should do otherwise); *Bozzo v. Nanasy*, No. 25-1199, ---F.4th---, 2025 WL 3295439, at *2 (6th Cir. Nov. 26, 2025) ("As both parties assume the discovery rule applies notwithstanding Supreme Court precedent, we take the case as presented to us."); *United States v. Williams*, 641 F.3d 758, 764 (6th Cir. 2011) ("[B]ecause the United States failed to request that we apply plain-error review, it has forfeited any argument that we should apply that standard, and we will review Williams's claim de novo."); *MSC Mediterranean Shipping Co. S.A. v. Fed. Mar. Comm'n*, 141 F.4th 222, 237–38 (D.C. Cir. 2025) ("[A]ppellant's failure to challenge the standard applied by lower court means that it 'has therefore forfeited any challenge to that aspect' of the lower court's decision." (quoting *Luu v. Comm'r,* No. 23-1149, 2024 WL 959876, at *1 (D.C. Cir. Mar. 6, 2024) (per curiam))).

claim must establish only that the defendant "acted deliberately (not accidentally), but also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Brawner*, 14 F.4th at 596 (quoting *Farmer*, 511 U.S. at 836).

We use a four-part test to determine whether a defendant violated a pretrial detainee's rights in the failure-to-protect context. *Westmoreland*, 29 F.4th at 728–29 (discussing *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc)). The plaintiff must show: (1) the defendant "act[ed] intentionally [(2)] in a manner that put[] the plaintiff at substantial risk of harm, [(3)] without taking reasonable steps to abate that risk, and [(4)] by failing to do so actually cause[d] the plaintiff's injuries." *Id.* at 729. The third element incorporates the recklessness requirement—the plaintiff must show that the defendant "acted with 'reckless disregard' in the face of 'an unjustifiably high risk of harm.'" *Id.* at 730 (quoting *Brawner*, 14 F.4th at 596). The four-part test laid out in *Westmoreland* is consistent with *Brawner*, which also required that the defendant's action be intentional rather than accidental. *Id.* at 729. The intentional-action requirement makes good sense, because the Supreme Court has held that accidental conduct does not violate the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 395–96 (2015).

In *Buetenmiller v. Macomb County Jail*, however, we described *Westmoreland* as holding that the intentional-conduct prong of the analysis was satisfied when "a reasonable juror could conclude that officials knew about" the danger to the plaintiff. 53 F.4th 939, 945–46 (6th Cir. 2022). The *Buetenmiller* court held that in the case before it, the plaintiff had not presented sufficient evidence to satisfy the intentional-conduct prong. *Id.* The brief analysis focused, in part, on the fact that "any concerns" the specific defendant had "were largely allayed" by a subsequent event he was aware of. *Id.* That analysis suggests that the court considered the defendant's subjective knowledge in evaluating whether the conduct was intentional. To the extent that *Buetenmiller* can be read as requiring subjective knowledge to satisfy the intentional-conduct prong, we hold that it is inconsistent with *Brawner*, and that *Brawner* continues to control. *See Helphenstine v. Lewis County*, 60 F.4th 305, 317 (6th Cir. 2023) (holding that earlier caselaw controls). This is in line with recent cases we have decided in the context of failure to provide adequate medical care, in which we held that *Brawner* controlled despite more

No. 25-5188                    *Poynter v. Bennett et al.*                    Page 16

recent caselaw that required plaintiffs to prove "prison official[s] *knew* that" the "failure to respond would pose a serious risk to the pretrial detainee" because the subjective knowledge requirement was inconsistent with *Brawner*'s holding that pretrial detainees need show only reckless disregard. *Helphenstine*, 60 F.4th at 316–17; *see also Grote*, 85 F.4th at 405–06. In the end, Poynter must demonstrate only that the unconstitutional action that harmed him was intentional (not accidental), recklessly placed him at a substantial risk of harm, and caused his injuries. *Westmoreland*, 29 F.4th at 728; *Brawner*, 14 F.4th at 596.

### 1. Intentional Conduct

Poynter has raised a genuine dispute of material fact as to whether the failure to classify Guess and Wix and their placement in cell 524 were intentional rather than accidental. Neither party suggests nor points to any evidence that BCDC accidentally failed to classify Guess and Wix or accidentally entered their classifications incorrectly. The same is true of their placement in cell 524—neither party suggests or cites evidence that suggests that they were accidentally placed in that cell instead of another cell. That type of accidental conduct would be the equivalent of an officer tripping and falling on a detainee or accidentally setting their taser off. *See Kingsley*, 576 U.S. at 396 (listing these and other examples of accidental conduct that would not violate the Constitution).

Instead, there is evidence that BCDC's failure to classify Guess and Wix was part of its larger custom of not classifying state detainees and failing to consider all detained persons' institutional histories. R. 100-5 (Hawkins Dep. at 19:11–20:13) (Page ID #817); R. 100-6 (Smith Dep. at 40:17–20) (Page ID #837); R. 95-5 (Boston Dep. at 27:21–28:6) (Page ID #522). BCDC has presented evidence to the contrary—that it did consider institutional history and classified state detainees on an ongoing basis, *see* R. 95-3 (Bennett Dep. at 22:23–25:18, 62:19–65:23, 116:13–17) (Page ID #458, 468, 481), but our task on summary judgment is not to resolve this material dispute of fact. A reasonable trier of fact could credit Poynter's evidence and find that the failure to classify Wix and Guess and placing them in general-population cell 524 were intentional, not accidental.

## 2. Substantial Risk of Harm

Next, the district court erred in holding that a reasonable trier of fact could not find that Poynter was at a substantial risk of harm from being placed in a cell with Guess and Wix, who both had violent histories in BCDC. "[T]his court has repeatedly observed that the risk of violent attack by fellow [incarcerated persons] known to have previously committed serious assaults, absent precautions, can create a substantial risk of serious harm." *Schoonover v. Rogers*, No. 21-3970, 2022 WL 12258998, at *6 (6th Cir. Oct. 21, 2022). In *Young v. Campbell County*, we held that the municipality's failure to reclassify the plaintiff's attacker based on his history of misconduct and his attack on the plaintiff was sufficient to show the plaintiff was objectively "incarcerated under conditions posing a substantial risk of serious harm." 846 F. App'x 314, 321 (6th Cir. 2021) (quoting *Farmer*, 511 U.S. at 834). The attacker had been disciplined for "making comments about [another detained person's] family and threatening to take commissary from him." *Id.* at 318 (citation modified). He had also made similar threats to another detained person, kicked the wall of his cell, acted aggressively towards deputies, and gotten into a fight with another detained person. *Id.* Likewise in *Richko v. Wayne County*, we held that "the risk to [the victim] of being housed with and attacked by a[] [detained person] who had recently been arrested for violent assault and had a history of serious mental illness was sufficient" to show a substantial risk of harm. 819 F.3d 907, 916 (6th Cir. 2016), *abrogated on other grounds by*, *Brawner*, 14 F.4th at 591–97.

Wix's and Guess's records of violence in BCDC are far lengthier than the record of the attacker in *Young*. As discussed above, Guess attacked other detained persons in his cell six times, fought with other detained persons twice, threatened others, and was involved in several verbal altercations. *See* Part I.A. Guess was also aggressive with jail staff four times, and BCDC staff had to restrain him physically on three of those occasions. *See id.* Wix had a lengthy history of violence too. He attempted to attack jail staff once, attacked other detained persons in his cell five times, and got into a fight with other detained persons in cell 524 shortly before the attack on Poynter. *See id.* Wix's and Guess's lengthy records of violence in BCDC are sufficient to create a genuine dispute of material fact as to whether Poynter was subject to a substantial risk of harm from being placed in a cell with them.

Against this conclusion, BCDC argues that because Guess and Wix had not attacked other detained persons in cell 524 before attacking Poynter, Poynter was not at a substantial risk of harm. *See* Appellee Br. at 26. True, there is no evidence that Guess and Wix initiated an attack on other detained persons in cell 524 before Poynter. There is evidence, however, that Wix was involved in a fight with two other detained persons in cell 524 on October 14, 2020. Wix did not start the fight, but after the fight had seemingly ended, Wix punched one of the detainees again and then fought with him until BCDC staff arrived. R. 101-2 (10/14/2020 Incident Report) (Page ID #889). That Guess and Wix had not initiated an attack on another detained person in cell 524 does not undermine our conclusion that there is ample evidence for a reasonable trier of fact to find that BCDC placed Poynter at a substantial risk of harm by putting him in a cell with Wix and Guess because of their histories of violence.

### 3. Reckless Disregard

Poynter has also presented evidence that would allow a trier of fact to conclude that BCDC recklessly disregarded the high risk of harm to Poynter from placing him in a cell with Guess and Wix, and that BCDC did not take reasonable action to abate the risk. This requires showing that "a *reasonable* [defendant] in the circumstances would have appreciated the high degree of risk involved and the obvious consequences of the defendant's conduct." *Westmoreland*, 29 F.4th at 730 (emphasis in original). A defendant "can be aware of a substantial risk when specific indicia show that a[] [detained person] with a history of attacks is likely to be violent again in the near future." *Schoonover*, 2022 WL 12258998, at *6.

Guess's and Wix's incident reports were recorded in JailTracker, R. 95-3 (Bennett Dep. at 125:3–127:15) (Page ID #483–84), and reports of the incidents should have "go[ne] up the[] chain of command." *Id.* at 34:22–35:13 (Page ID #461). BCDC had all the relevant information about Guess's and Wix's violent pasts at its disposal when BCDC placed Poynter in cell 524. Poynter's expert testified that Guess's and Wix's incident reports were sufficient to show that they should not have been housed in a general-population cell. R. 95-7 (Eiser Dep. at 37:1–39:20, 51:8–20) (Page ID #550–51, 554). Therefore, there is evidence in the record that would allow a reasonable trier of fact to find that BCDC was reckless in failing to appreciate the high degree of risk and obvious consequences of its action and not taking steps to abate that risk, such

as reclassifying Guess and Wix and moving them out of general population. The risk is not, as BCDC argues, "a *general* theory that would apply just as much to any assault at the jail," because the substantial risk was created by the specific inmates in "the cell in which [Poynter] was detained." *Beck v. Hamblen County*, 969 F.3d 592, 601 (6th Cir. 2020) (emphasis in original); *see also Richko*, 819 F.3d at 918.

### 4. Causation

Finally, Poynter has raised a genuine dispute of material fact as to causation. Poynter was attacked and suffered serious physical harm after being placed in cell 524 with Guess and Wix. Poynter's expert concluded that if BCDC properly classified Guess and Wix, they would not have been in the same cell as Poynter and more likely than not the attack could have been prevented. R. 95-7 (Eiser Dep. at 96:5–15) (Page ID #565). We have held that a plaintiff presented a genuine question of material fact as to causation when he was "labeled a snitch" and the jail failed to move him away from his cellmates who later assaulted him. *Westmoreland*, 29 F.4th at 730. As in *Westmoreland*, a reasonable trier of fact could conclude that, if Wix and Guess had been classified properly and not placed in general population, Poynter would not have been hurt.

Resisting this conclusion, BCDC seemingly presents two arguments. First, they argue that Poynter did not notify BCDC that he needed to be removed from the cell. Appellee Br. at 22. But, on the same page of the brief, BCDC asserts that Poynter did not know Guess and that he was not afraid of Wix. *Id.* Given that concession, the evidence does not clearly establish that Poynter should have known he was likely to be attacked before it occurred. The speed of the assault also made it impossible for Poynter to notify BCDC that he was in danger after the assault began. Video Footage at 01:20–01:25. Second, BCDC argues that Poynter was housed with Guess and Wix because they had all recently been booked into the jail and COVID-19 protocols required recently booked detained persons to be housed together. Appellee Br. at 26–28. The testimony BCDC cites in support of this argument, when read in the light most favorable to Poynter, does not support BCDC's argument. For example, Bennett testified that BCDC would move newly booked detained persons "to that 524 type area" and not only to cell 524, which suggests that there were other cells that housed recently booked detained persons that

No. 25-5188                     *Poynter v. Bennett et al.*                     Page 20

Poynter could have been placed in.  R. 95-3 (Bennett Dep. at 94:21–95:18) (Page ID #476).
Indeed, BCDC points to no factual evidence that COVID-19 protocols superseded or obviated its
responsibility to classify detainees properly, or did not allow it to do so.

In the end, there is a genuine dispute of material fact as to whether Poynter's Fourteenth
Amendment rights were violated by BCDC's deliberate indifference to his safety.  The district
court erred in holding otherwise.

## C.  *Monell* **Liability**

Poynter argues that BCDC had a custom of failing to properly classify detained persons,
even though its written policy required BCDC to do so.  Appellant Br. at 22.  Poynter's claim is
based on BCDC's inaction—a custom of failing to properly classify inmates—so he must
demonstrate a "clear and persistent pattern of unconstitutional conduct," notice or constructive
notice to the municipality, "tacit approval of the unconstitutional conduct" such that deliberate
indifference can be considered an "official policy of inaction," and causation.  *Franklin*, 115
F.4th at 472 (quoting *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

### 1.  **Clear and Persistent Pattern**

Poynter has presented evidence that would allow a trier of fact to find that there was a
clear and persistent pattern of unconstitutional conduct.  In order for violations to create a pattern
for purposes of municipal liability, they must violate the "same constitutional right[] . . . in the
same way."  *Id.* at 472 (quoting *Berry v. Delaware Cnty. Sheriff's Off.*, 796 F. App'x 857, 863
(6th Cir. 2019)).  The incidents, however, need not be "identical, or even 'almost identical.'"  *Id.*
(quoting *Simpkins v. Boyd Cnty. Fiscal Ct.*, No. 21-5477, 2022 WL 17748619, at *13 (6th Cir.
Sep. 2, 2022)).  We have held that five violations over three years were sufficient to establish a
pattern, *id.* (citing *Simpkins*, 2022 WL 17748619, at *13), but that two incidents that occurred
during one investigation, in addition to the violation for which the plaintiff asserted a claim, were
insufficient, *Peet v. City of Detroit*, 502 F.3d 557, 567–68 (6th Cir. 2007).

Guess and Wix had collectively assaulted their cellmates eleven times before they
attacked Poynter.  Because the incidents must violate the same constitutional right in the same

No. 25-5188                    *Poynter v. Bennett et al.*                    Page 21

way, *Franklin*, 115 F.4th at 472, Poynter must show the attacks occurred because of BCDC's failure to properly classify Guess and Wix. Poynter has presented sufficient evidence to do so. Starting with an analysis of Guess's incident reports, before he first assaulted another detained person, he was so combative with BCDC staff that they took him "down to the floor." R. 101-2 (2/7/2007 Incident Report) (Page ID #856). After being taken down to the floor, Guess continued to resist. *Id.* After Guess's first assault on another detained person, he was verbally abusive and refused to comply with BCDC staff orders leading them to pepper spray him, and the police informed BCDC that Guess was placing threatening phone calls. R. 101-2 (1/23/2010 Incident Report) (Page ID #858); R. 101-2 (12/1/2011 Incident Report) (Page ID #859).

Guess then committed his second assault on another detained person. R. 101-2 (12/26/2012 Incident Report) (Page ID #860). Before he did so again for a third time, Guess got into a fight with cellmates and BCDC staff found threatening notes in his cell that they believed Guess had written. R. 101-2 (8/26/2018 Incident Report) (Page ID #861); R. 101-2 (10/01/2018 Incident Report) (Page ID #862). Guess then committed a third assault on another detained person who had just been placed in his cell. R. 101-2 (5/4/2019 Incident Report) (Page ID #863). Based on this history, a reasonable trier of fact could conclude that before Guess assaulted another detained person for the fourth time, he posed a substantial threat to the safety of others in his cell. *See Young*, 846 F. App'x at 321; *Richko*, 819 F.3d at 916. And with each of his three subsequent attacks on others, the evidence that Guess posed a substantial threat to the safety of others grew. Despite this, BCDC does not cite any evidence that it reclassified Guess or analyzed whether he should have been reclassified based on his conduct other than general testimony that it reclassified all detained persons on a continuing basis. *See* Appellee Br. at 25–26 (citing R. 95-3 (Bennett Dep. at 62:19–65:23, 116:13–17) (Page ID #468, 481) and R. 100-5 (Hawkins Dep.) (Page ID #818)). Additionally, BCDC did not produce any documents showing it conducted a classification analysis—let alone one that included analysis of Guess's institutional history—or determined that Guess could no longer be housed in general population. R. 95-7 (Eiser Dep. at 54:18–55:3, 60:22–24, 67:9–68:16) (Page ID #555, 556, 558).

Turning to Wix, prior to his first attack on another detained person, he charged toward a BCDC staff member with both fists raised with the "intent to become combative" after saying

"fuck this" when a staff member gave him a command.  R. 101-2 (9/28/2010 Incident Report) (Page ID #881).  Wix then attacked other detained persons in his cell three times.  R. 101-2 (12/27/2013 Incident Report) (Page ID #884); R. 101-2 (2/15/2014 Incident Report) (Page ID #885); R. 101-2 (7/19/2017 Incident Report) (Page ID #886).  After the third attack, a reasonable trier of fact could find that Wix posed a substantial threat to the safety of others in his cell.  *See Young*, 846 F. App'x at 321; *Richko*, 819 F.3d at 916.  Like Guess, the evidence that Wix posed a substantial threat to the safety of others grew with the two subsequent attacks Wix committed, but BCDC does not point to any evidence or documentation showing that Wix was reclassified after these incidents, or that BCDC considered reclassifying him.  R. 95-7 (Eiser Dep. at 54:18–55:3, 60:22–24, 67:9–68:2) (Page ID #555, 556, 558); Appellee Br. at 25–26 (citing R. 95-3 (Bennett Dep. at 62:19–65:23, 116:13–17) (Page ID #468, 481) and R. 100-5 (Hawkins Dep.) (Page ID #818)).

Despite the danger that Guess and Wix posed to other persons detained in BCDC, the evidence shows that they were continually placed in general-population cells where they assaulted others.  Bennett testified that detained persons in BCDC were housed in general-population cells unless they were in protective custody, lockdown, administrative segregation, or medical cells.  *See* R. 95-3 (Bennett Dep. at 106:9–114:2) (Page ID #479–81).[9]  Evidence in the record suggests that the two protective custody cells in BCDC were 509 and 512, and that the medical cell was 401, although other segregation cells could be used as medical cells as needed.  R. 100-5 (Hawkins Dep. at 11:15–25) (Page ID #815); R. 95-5 (Boston Dep. at 34:19–35:24) (Page ID #524); R. 95-3 (Bennett Dep. at 107:3–11) (Page ID #479).  The segregation cells for detained persons who needed additional protection or were a threat to others only had one bed.  R. 95-3 (Bennett Dep. at 111:11–114:2) (Page ID #480–81).

It follows that unless Guess and Wix were in cells 401, 509, or 512, or in a cell with a single bed, they were housed in general population.  The reports reflect that they were not in any of those cells and were, instead, consistently in cells with other detained persons.  *See* R. 101-2 (5/11/2019 Incident Report) (Page ID #864) (Cell 513); R. 101-2 (9/3/2019 Incident Report)

---

[9]Additionally, there were different cells for COVID-19 separation, but that is irrelevant to the incidents that occurred prior to the onset of COVID-19 in the United States.  *Id.*

(Page ID #866) (Cell 520); R. 101-2 (1/24/2020 Incident Report) (Page ID #874) (Cell 328); R. 101-2 (5/11/2019 Incident Report) (Page ID #887) (Cell 513); R. 101-2 (2/15/2020 Incident Report) (Page ID #888) (Cell 614).  Therefore, a reasonable trier of fact could conclude that Guess and Wix were in general-population cells when they assaulted other detained persons a collective five times after they presented a substantial risk to others and that, following their assaults, they were not reclassified or subject to new classification based on their institutional history.

Nevertheless, the district court held that there was no evidence that these incidents occurred because BCDC did not properly classify detained persons.  As described above, however, the record shows that Guess and Wix attacked others in general-population cells, and BCDC did not produce any evidence or documents showing that Guess's or Wix's classification statuses were changed because of their violent behavior or that BCDC considered changing their classifications.  Nor did BCDC provide evidence that, when Guess and Wix returned to the facility on new offenses, BCDC considered their past behavioral history—including several violations for assaulting other detained persons in their cells—when making housing determinations.  Construing the testimony in Poynter's favor, BCDC's expert testified that if BCDC had made a classification determination that Guess or Wix were a threat to others and could not be housed in general-population cells on a more continuing basis, it should have been documented.  R. 100-4 (Sweeney Dep. at 104:24–105:21) (Page ID #786).  A reasonable trier of fact could therefore infer that the failure to reclassify Guess and Wix based on their violent behavior caused the assaults.  A reasonable trier of fact could also infer that the failure to reclassify Guess and Wix after their violent attacks occurred because BCDC had a custom of failing to consider institutional history when classifying detainees.

To rebut this reasonable inference, BCDC could have pointed to evidence that Guess and Wix were housed in general-population cells because they were reclassified based on good behavior between incidents.  BCDC, however, points to nothing in the record to show that is what led to Guess and Wix being in general-population cells, as opposed to its failure ever to classify or reclassify them.  Poynter has therefore presented evidence to allow a reasonable trier of fact to find that the five assaults committed by Guess and Wix collectively in general-

population cells over the year-and-a-half prior to their attack on Poynter establish a pattern of constitutional violations. *Franklin*, 115 F.4th at 472; *Simpkins*, 2022 WL 17748619, at *13 (holding that five prior violations over three years were sufficient to constitute a pattern).

### 2. Notice

Poynter must next establish a genuine issue of material fact showing that BCDC had actual or constructive notice of the unconstitutional conduct. *Franklin*, 115 F.4th at 472. This can be established by showing a pattern of similar constitutional violations that the county was on actual or constructive notice of. *See Nouri v. County of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015); *D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014). The Supreme Court has held that four constitutional violations over ten years were insufficient to establish notice when the prior violations were not sufficiently similar. *Connick v. Thompson*, 563 U.S. 51, 62–63 (2011); *see also D'Ambrosio*, 747 F.3d at 388 (holding that three prior instances of one prosecutor engaging misconduct were insufficient to provide notice). As discussed above, however, the prior violations in this case are sufficiently similar to the violation experienced by Poynter to have put BCDC on notice.

A reasonable trier of fact could conclude that five similar incidents over a year-and-a-half were "enough . . . to put" BCDC "on notice" that the custom violated the Constitution. *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989); *see also Beck v. City of Pittsburgh*, 89 F.3d 966, 969–70, 973 (3d Cir. 1996) (holding that four complaints over three years were sufficient to establish that the chief of police had notice of the constitutional violations). Guess's and Wix's assaults on other detained persons were documented, and the incident reports would have been available in their JailTracker files. *See* R. 95-3 (Bennett Dep. at 125:3–20) (Page ID #483); R. 95-5 (Boston Dep. at 37:6–12) (Page ID #525). Additionally, when deputies made an incident report they should have "go[ne] up their chain of command" and relayed information about the incident. R. 95-3 (Bennett Dep. at 34:22–35:13) (Page ID #461). And in its brief, BCDC stated that it "investigated each of the incidents referenced in the reports," Appellee Br. at 25, which further supports a finding of notice.

No. 25-5188                    *Poynter v. Bennett et al.*                    Page 25

### 3. Tacit Approval

Next, Poynter must show tacit approval of the unconstitutional conduct by BCDC that amounts to deliberate indifference. *Franklin*, 115 F.4th at 472. This can be established by showing the municipality took no action to correct the unconstitutional conduct of which it was on notice. *Leach*, 891 F.2d at 1248; *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005); *Richardson v. Huber Heights City Sch. Bd. of Educ.*, 651 F. App'x 362, 367 (6th Cir. 2016). BCDC points to nothing in the record that shows that any action was taken to correct the custom of failing to properly classify detained persons and consider their institutional behavioral history. Even though the incident reports show Guess and Wix were punished for some of the assaults, for example, by placing them in administrative segregation for a limited period after the incidents, *see, e.g.*, R. 101-2 (05/11/2019 Incident Report) (Page ID #887), there is no indication that any action was taken to correct their classifications or to bring BCDC's classification practice into compliance with its written policy. Guess and Wix also continued to assault other detained persons, so a reasonable trier of fact could conclude that the punishments BCDC imposed on them were ineffective and that BCDC was aware of the ineffectiveness. A reasonable trier of fact could also conclude that BCDC's failure to take effective corrective action showed it tacitly approved of or was deliberately indifferent to the high risk of harm to detained persons from placing them in a cell with Guess and Wix, or other detained persons with long histories of violence, and did not take reasonable action to abate the risk.

### 4. Causation

Finally, Poynter must show that BCDC's custom caused his injuries. *Franklin*, 115 F.4th at 472. As detailed above in Part II.B., Poynter has raised a genuine dispute of material fact as to causation.

### III. CONCLUSION

For the foregoing reasons, Poynter has presented sufficient evidence to create a genuine dispute of material fact as to all required elements of his *Monell* claim. Therefore, we **REVERSE** the district court's summary judgment order and **REMAND** for proceedings consistent with this opinion.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 25-5188

LUTHER POYNTER, by and through his guardian, Anita Fernandez,

       Plaintiff - Appellant,

       v.

AARON BENNETT, in his official capacity as Barren County Jailer; BARREN COUNTY, KENTUCKY,

       Defendant - Appellee.

> **FILED**
> Dec 17, 2025
> KELLY L. STEPHENS, Clerk

Before:  MOORE, CLAY, and WHITE, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's grant of summary judgment to the defendants is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_Kelly L. Stephens_

_____
Kelly L. Stephens, Clerk



**User Name:** J.A. Sowell

**Date and Time:** Tuesday, December 30, 2025 2:31 PM CST

**Job Number:** 271700742

## Document (1)

1. *Davis v. Chorak*

   **Client/Matter:** -None-

   **Search Terms:**

   **Search Type:** Natural Language

   **Narrowed by:**

| Content Type | Narrowed by |
|---|---|
| | -None- |

⬥ Positive
As of: December 30, 2025 8:31 PM Z

# *Davis v. Chorak*

United States Court of Appeals for the Sixth Circuit

March 14, 2023, Filed

File Name: 23a0130n.06

Case No. 22-1839

**Reporter**

2023 U.S. App. LEXIS 6133 *; 2023 FED App. 0130N (6th Cir.); 2023 WL 2487339

JOSEPH EDWARD DAVIS, Plaintiff-Appellant, v. ZACHARY DAVID CHORAK, Defendant, DEPUTY A. TOOKER; DEPUTY J. C. SCAVARDA; EATON COUNTY, MICHIGAN, a municipal corporation organized under the laws of the State of Michigan, Defendants-Appellees.

**Notice:** CONSULT *6TH CIR. R. 32.1* FOR CITATION OF UNPUBLISHED OPINIONS AND DECISIONS.

**Prior History: [\*1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN.

## Core Terms

motion to dismiss, pretrial detainee, district court, inmate, convicted prisoner, substantial risk, pleadings, videos, Jail

## Case Summary

**Overview**

HOLDINGS: [1]-The plaintiff's claim that the district court erred by granting the defendants' motion to dismiss the plaintiff's federal claims against the defendants for violating his constitutional rights by failing to protect him from an attack of a fellow inmate since the district court erred by considering material outside of the pleadings at the motion to dismiss stage lacked merit because the district court considered materials that were part of the pleadings and was not required to convert the defendant's motion to one for summary judgment since the record showed the district court properly took judicial notice of the dockets in the plaintiff's cases to determine the date on which he pled guilty and two videos showing the inmate attack on the defendant and a recording of an interview with the

defendant about the assault.

**Outcome**

Judgment affirmed.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > Notice Requirement

*HN1* **Motions to Dismiss, Failure to State Claim**

A district court should generally consider only the pleadings when ruling on a motion to dismiss. If the district court must consider material outside the pleadings, it should treat the motion to dismiss as a motion for summary judgment under *Fed. R. Civ. P. 56*.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN2* **Motions to Dismiss, Failure to State Claim**

The complaint isn't the only record considered part of the pleadings. At the motion-to-dismiss stage, a district court may also consider exhibits attached to the complaint, public records, items appearing in the record of the case and materials appropriate for the taking of judicial notice. It may also review exhibits attached to

J.A. Sowell

defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein. And in qualified-immunity cases, to facilitate speedy resolution and protect officers from suit, district courts may also examine video evidence while resolving a motion to dismiss.

Civil Procedure > Trials > Jury Trials > Right to Jury Trial

Constitutional Law > Bill of Rights > Fundamental Rights > Trial by Jury in Civil Actions

### HN3 Jury Trials, Right to Jury Trial

Dismissal imposed after proper use of *Fed. R. Civ. P. 12* does not violate the *Seventh Amendment*.

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

### HN4 Fundamental Rights, Cruel & Unusual Punishment

The distinction between a pre trial detainee and a convicted prisoner matters because while the *Fourteenth Amendment* protects pretrial detainees, the *Eighth Amendment* protects convicted prisoners. What violates the *Fourteenth Amendment* doesn't necessarily violate the *Eighth Amendment*. Pretrial detainees receive different protections because, unlike convicted prisoners, they have not been adjudged guilty of any crime.

Civil Rights Law > Protection of Rights > Prisoner Rights > Safety

Constitutional Law > Bill of Rights > Fundamental Rights > Cruel & Unusual Punishment

### HN5 Prisoner Rights, Safety

A plaintiff's status as a pretrial detainee or convicted prisoner determines how the appellate court analyze his or her failure-to-protect claim. If a plaintiff is a convicted

prisoner, he or she must plausibly allege that: (1) objectively, he or she was incarcerated under conditions posing a substantial risk of serious harm, and (2) the officials acted with deliberate indifference to the plaintiff's safety, meaning the officials were subjectively aware of the risk and failed to take reasonable measures to abate it. In other words, to show an *Eighth Amendment* violation, he or she must satisfy a test with both an objective and a subjective prong. If the plaintiff is a pretrial detainee, however, circuit precedent dictates that he or she needs only make an objective showing that an individual defendant acted, or failed to act, deliberately and recklessly. Both tests incorporate an objective prong.

Civil Rights Law > ... > Scope > Law Enforcement Officials > Custody

Constitutional Law > Substantive Due Process > Scope

### HN6 Law Enforcement Officials, Custody

A pretrial detainee bringing a failure-to-protect claim against an individual officer must satisfy a four-part test to show a violation of the *Fourteenth Amendment*. First, the detainee must plausibly allege that: (1) the officer made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the officer failed to take reasonable available measures to abate that risk; and (4) by failing to take such measures, the officer caused the plaintiff's injuries.

Civil Procedure > ... > Defenses, Demurrers & Objections > Affirmative Defenses > Immunity

### HN7 Affirmative Defenses, Immunity

The appellate court repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation.

Governments > Local Governments > Claims By & Against

### HN8 Local Governments, Claims By & Against

There can be no liability under Monell v. Department of Social Services without an underlying constitutional violation.

**Counsel:** For JOSEPH EDWARD DAVIS, Plaintiff - Appellant: J. Nicholas Bostic, Law Office, Lansing, MI.

For DEPUTY A. TOOKER, DEPUTY J. C. SCAVARDA, EATON COUNTY, MI, a municipal corporation organzied under the laws of the State of Michigan, Defendant - Appellee: Heather Elizabeth Sumner, Rosati Schultz Joppich & Amtsbuechler, Lansing, MI.

**Judges:** Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

**Opinion by:** THAPAR

# Opinion

THAPAR, Circuit Judge. While in custody at the Eaton County Jail, Joseph Davis suffered injuries after another inmate attacked him. So Davis sued his attacker for damages under state law. He also brought federal claims against jail employees and Eaton County, alleging they violated his constitutional rights by failing to protect him from the attack. The district court granted the defendants' motion to dismiss, and we affirm.

I.

When inmates are booked into the Eaton County Jail, officials assign each inmate a security classification. Inmates classified at the same level are typically housed together. Joseph Davis was classified as a medium security risk when he entered the jail in September 2019. When Zachary **[*2]** Chorak arrived in February 2020, Deputy Scavarda classified him as a medium-high security risk.

Jail employees regularly review and revise inmate security classifications. So, over time, Davis and Chorak's classifications fluctuated. For the most part, Davis remained at medium, though he jumped to medium-high for a month. Chorak, by contrast, started at medium-high, but dropped to medium in May 2020. So by July 2, 2020, both Davis and Chorak were classified as medium security risks. That day, while Davis, Chorak, and a third inmate were playing cards together, Davis accused Chorak of cheating. Without warning, Chorak attacked Davis, punching him in the face. Davis was hospitalized for his injuries, ultimately losing vision in his left eye.

Davis filed a complaint in federal court and consented to have his case assigned to a magistrate judge. He sued Chorak for assault and battery under Michigan law; he sued Deputies Scavarda and Tooker under _42 U.S.C. § 1983_ for failing to protect him from Chorak's attack; and he sued Eaton County under _§ 1983_ for failing to adequately train and supervise the deputies.

The deputies and Eaton County moved to dismiss for failure to state a claim. _See Fed. R. Civ. P. 12(b)(6)_. The court granted the **[*3]** motion, relying in part on Davis's and Chorak's state-court criminal dockets and videos of their fight. It then declined to exercise supplemental jurisdiction over Davis's state-law claim against Chorak, dismissing it without prejudice. Davis timely appealed.

II.

Davis first argues that the district court erred by considering material outside of the pleadings at the motion-to-dismiss stage. We disagree.

_HN1_ A district court should generally consider only the pleadings when ruling on a motion to dismiss. _Rondigo, L.L.C. v. Township of Richmond, 641 F.3d 673, 680 (6th Cir. 2011)_. If the court must consider "material outside the pleadings," it should treat the motion to dismiss as a motion for summary judgment under _Federal Rule of Civil Procedure 56_. _Id._

That said, _HN2_ the complaint isn't the only record "considered part of the pleadings." _Amini v. Oberlin Coll., 259 F.3d 493, 502 (6th Cir. 2001)_ (quotation omitted). At the motion-to-dismiss stage, a district court may also consider "exhibits attached to the complaint, public records, items appearing in the record of the case," _Rondigo, 641 F.3d at 680-81_ (cleaned up), and materials "appropriate for the taking of judicial notice," _New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP, 336 F.3d 495, 501 (6th Cir. 2003)_. It may also review "exhibits attached to defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." _Rondigo, 641 F.3d at 681_ (quoting _Bassett v. NCAA, 528 F.3d 426, 430 (6th Cir. 2008)_). And in qualified-immunity **[*4]** cases—to facilitate speedy resolution and protect officers from suit—courts may also examine video evidence while resolving a motion to dismiss. _See Bell v. City of Southfield, 37 F.4th 362, 364 (6th Cir. 2022)_.

Here, everything the district court considered was fair game. First, the court properly took judicial notice of the dockets in Davis's cases to determine the date on which

he pled guilty. That's no problem. *See New Eng. Health, 336 F.3d at 501*. Second, the court considered two videos: one was of Chorak's attack on Davis, and the other was a recording of an interview with Davis about the assault. That's no problem either, especially since neither party disputes any of the facts in the videos. *See Bell, 37 F.4th at 364*. And even if the court erred in considering them, any error would've been harmless because the court made clear that the videos were "not critical to [its] determination." R. 24, Pg. ID 282.

Thus, the court only considered materials that were "part of the pleadings," and it wasn't required to convert defendants' motion to one for summary judgment.[1]

III.

Davis next argues that on July 2, 2020, he was a pretrial detainee—not a convicted prisoner. *HN4* This distinction matters because while the *Fourteenth Amendment* protects pretrial detainees, the *Eighth Amendment* protects convicted prisoners. *Greene v. Crawford County, 22 F.4th 593, 605-07 (6th Cir. 2022)*. And under our caselaw, what **[*5]** violates the *Fourteenth Amendment* doesn't necessarily violate the *Eighth Amendment*. *Id.; see also Westmoreland v. Butler County, 29 F.4th 721, 729 (6th Cir. 2022)*. Indeed, pretrial detainees receive different protections because, unlike convicted prisoners, they have "not been adjudged guilty of any crime." *Bell v. Wolfish, 441 U.S. 520, 536, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)*.

So *HN5* Davis's status as a pretrial detainee or convicted prisoner determines how we analyze his failure-to-protect claim. If Davis is a convicted prisoner, he must plausibly allege that "(1) objectively, he was incarcerated under conditions posing a substantial risk of serious harm, and (2) the official[s] acted with deliberate indifference to [Davis's] safety, meaning the official[s were] subjectively aware of the risk and failed to take reasonable measures to abate it." *Reedy v. West, 988 F.3d 907, 912 (6th Cir. 2021)* (cleaned up). In other words, to show an *Eighth Amendment* violation, he must satisfy a test with "both an objective and a subjective prong." *Westmoreland, 29 F.4th at 728*. If Davis is a pretrial detainee, however, circuit precedent

dictates that he need only make "an objective showing that an individual defendant acted (or failed to act) deliberately and recklessly." *Id.* (citing *Brawner v. Scott County, 14 F.4th 585, 596 (6th Cir. 2021)*).

In short, both tests incorporate an objective prong. And because Davis can't make an objective showing, he fails under either test.

IV.

Let's give Davis the benefit of the doubt **[*6]** and assume he was a pretrial detainee. That means only an objective showing is required. Even so, Davis failed to plausibly allege his claims against the deputies and Eaton County.

A.

*HN6* Under our caselaw, a pretrial detainee bringing a failure-to-protect claim against an individual officer must satisfy a four-part test to show a violation of the *Fourteenth Amendment*. First, the detainee must plausibly allege that: (1) the officer "made an intentional decision with respect to the conditions under which the plaintiff was confined;" (2) "[t]hose conditions put the plaintiff at substantial risk of suffering serious harm;" (3) the officer failed to "take reasonable available measures to abate that risk;" and (4) by failing to take such measures, the officer "caused the plaintiff's injuries." *Id. at 729*.

On the first element, Davis plausibly alleged that Deputies Tooker and Scavarda made intentional security-classification decisions. Indeed, the parties agree that Davis satisfied this aspect of the test.

On the remaining elements, however, Davis's allegations fall short. Turning to the second element, Davis failed to plausibly allege that the deputies' security-classification decision put him "at substantial risk of suffering **[*7]** serious harm." *Id.* Although he asserts that Chorak's criminal history and prior behavioral problems created a general security risk, Davis failed to allege facts suggesting he was personally at "substantial risk of assault." *Id.* Instead, Davis acknowledges that he had been housed with Chorak for two months without any incident at all. And he expressly alleges that Chorak's attack was "without warning." R. 1, Pg. ID 3. So Davis fails to demonstrate a "substantial risk" that Chorak would attack him. And of course, identifying such a risk is a prerequisite to showing the deputies failed to "take reasonable available measures to abate that risk" (the third

---

[1] To the extent Davis claims a *Seventh Amendment* violation, that argument also fails. As Davis himself admits, *HN3* "dismissal imposed after proper use of *Rule 12* . . . does not violate the *Seventh Amendment*." Appellant Br. at 9. Because the district court properly dismissed the case under *Rule 12*, there was no *Seventh Amendment* violation.

element), and thereby "caused the plaintiff's injuries" (the fourth). *Westmoreland, 29 F.4th at 729*.

Because Davis failed to allege that Deputies Tooker and Scavarda violated the *Fourteenth Amendment*, he necessarily fails the *Eighth Amendment's* more demanding test as well. Since Davis doesn't allege a constitutional violation, the deputies are entitled to qualified immunity, and the district court properly granted their motion to dismiss. *See Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)* **HN7** ("[W]e repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." (quotation omitted)); *Bell, 37 F.4th at 364* (highlighting **[*8]** importance of vindicating officers' entitlement to qualified immunity "at the earliest possible stage" of litigation).

B.

Davis also sued Eaton County, alleging that the County failed to train and supervise Deputies Tooker and Scavarda on proper security-classification procedures. He brought that claim under *Monell v. Department of Social Services*, which held that a municipality is liable for the constitutional violations of its employees if those violations resulted from an official policy or custom. *See 436 U.S. 658, 694-95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. **HN8** But "[t]here can be no liability under *Monell* without an underlying constitutional violation." *Robertson v. Lucas, 753 F.3d 606, 622 (6th Cir. 2014)*. Because Davis has not plausibly alleged that the deputies violated the Constitution, his *Monell* claim must also fail.

* * *

We affirm.

---

**End of Document**