**No. 25-5188**

_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

LUTHER POYNTER, by and through his guardian, ANITA FERNANDEZ,

*Plaintiff-Appellant,*

*v.*

AARON BENNETT, in his official capacity as Barren County Jailer, and BARREN COUNTY, KENTUCKY,

*Defendants-Appellees.*

_____

On Appeal from the United States District Court for the Western District of Kentucky, Case No. 1:21-cv-00162

_____

## PLAINTIFF-APPELLANT'S SUPPLEMENTAL EN BANC BRIEF

William M. Butler, Jr.
500 West Jefferson Street
Suite 1520
Louisville, KY 40202
(502) 582-2020
wmb@kycriminallawyer.com

Elizabeth R. Cruikshank
*Counsel of Record*
Kelsi Brown Corkran
William Powell
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION, GEORGETOWN LAW
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-4048
erc56@georgetown.edu

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................. 1

ARGUMENT ..................................................................................................................... 5

  I.  The Court Should Apply the Objective Standard Articulated in *Kingsley*............. 5

    A.  Departing from the *Kingsley* Standard Would Violate the Party Presentation Rule. .................................................................................................................... 5

    B.  Poynter's Claim Arises Under the Fourteenth Amendment and Thus Implicates the *Kingsley* Standard ..................................................................... 7

  II.  Regardless of the Standard, Poynter Overcomes Summary Judgment. .......... 17

    A.  Poynter Suffered Constitutional Injury Under Either Standard. .................. 17

    B.  The County Is Liable Under *Monell*. ............................................................... 20

CONCLUSION ............................................................................................................... 25

CERTIFICATE OF COMPLIANCE ......................................................................... 27

CERTIFICATE OF SERVICE .................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alkire v. Irving,*
330 F.3d 802 (6th Cir. 2003) ................................................................ 22

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,*
520 U.S. 397 (1997) .......................................................................21, 22, 23

*Bell v. Wolfish,*
441 U.S. 520 (1979) ................................................................ 13, 15

*Block v. Rutherford,*
468 U.S. 576 (1984) ................................................................ 13, 14

*Brawner v. Scott County,*
14 F.4th 585 (6th Cir. 2021) ................................................................ 6, 16

*Burrell v. Loungo,*
750 F. App'x 149 (3d Cir. 2018) ................................................................ 11

*Clark v. Sweeney,*
607 U.S. 7 (2025) ................................................................ 5, 6

*Collins v. City of Harker Heights,*
503 U.S. 115 (1992) ................................................................ 14

*Connick v. Thompson,*
563 U.S. 51 (2011) .......................................................................22, 24

*Doe v. Claiborne County,*
103 F.3d 495 (6th Cir. 1996) ................................................................ 24

*Epps v. Lauderdale County,*
45 F. App'x 332 (6th Cir. 2002) ................................................................ 21

*Estelle v. Gamble,*
429 U.S. 97 (1976) ................................................................ 11

*Farmer v. Brennan,*
511 U.S. 825 (1994) .......................................................................5, 7, 12, 16, 17, 18, 19

*Franklin v. Franklin County,*
115 F.4th 461 (6th Cir. 2024) ................................................................ 23

*Garner v. Memphis Police Dep't,*
8 F.3d 358 (6th Cir. 1993) ................................................................ 22

*Gompers v. Buck's Stove & Range Co.*,
   221 U.S. 418 (1911) ................................................................ 8, 9, 16

*Graham v. Connor*,
   490 U.S. 386 (1989) ........................................................................ 15

*Greenlaw v. United States*,
   554 U.S. 237 (2008) .......................................................................... 5

*Gregory v. City of Louisville*,
   444 F.3d 725 (6th Cir. 2006) .......................................................... 23

*Grote v. Kenton County*,
   85 F.4th 397 (6th Cir. 2023) ...................................................... 4, 21

*Helling v. McKinney*,
   509 U.S. 25 (1993) .......................................................................... 18

*Hopper v. Plummer*,
   887 F.3d 744 (6th Cir. 2018) ................................ 6, 8, 9, 10, 16

*In re Grand Jury Procs.*,
   280 F.3d 1103 (7th Cir. 2002) ........................................................ 11

*Ingraham v. Wright*,
   430 U.S. 651 (1977) ........................................................................ 10

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
   512 U.S. 821 (1994) ................................................................. 8, 9, 10

*Kingsley v. Hendrickson*,
   576 U.S. 389 (2015) ........................................................ 5, 11, 15, 16

*Los Angeles County v. Humphries*,
   562 U.S. 29 (2010) .......................................................................... 21

*Manhattan Indus., Inc. v. Sweater Bee ex rel. Banff, Ltd.*,
   885 F.2d 1 (2d Cir. 1989) ................................................................ 10

*Mirabelli v. Bonta*,
   146 S. Ct. 797 (2026) ...................................................................... 12

*Monell v. Dep't of Soc. Servs. of City of New York*,
   436 U.S. 658 (1978) ........................................................................ 21

*Morgan v. Fairfield County*,
   903 F.3d 553 (6th Cir. 2018) .................................................21, 22, 23

*Richko v. Wayne County*,
   819 F.3d 907 (6th Cir. 2016) ....................................................18, 19

iii

*Schall v. Martin*,
467 U.S. 253 (1984) ............................................................................................ 14

*Schoonover v. Rogers*,
No. 21-3970, 2022 WL 12258998 (6th Cir. Oct. 21, 2022) ........................................ 18

*Spallone v. United States*,
487 U.S. 1251 (1988) ........................................................................................... 10

*Thomas v. City of Chattanooga*,
398 F.3d 426 (6th Cir. 2005) ...................................................................23, 24, 25

*United States v. Dien*,
598 F.2d 743 (2d Cir. 1979) ...............................................................................8, 10

*United States v. Harris*,
582 F.3d 512 (3d Cir. 2009) ................................................................................ 10

*United States v. Salerno*,
481 U.S. 739 (1987) ............................................................................................. 14

*United States v. Sineneng-Smith*,
590 U.S. 371 (2020) ........................................................................................5, 6, 7

*United States v. Work Wear Corp.*,
602 F.2d 110 (6th Cir. 1979) ............................................................................... 8

*Uphaus v. Wyman*,
360 U.S. 72 (1959) .............................................................................................. 8, 9

*Westmoreland v. Butler County*,
29 F.4th 721 (6th Cir. 2022) ......................................................................6, 17, 19

*Wilson v. Seiter*,
501 U.S. 294 (1991) ............................................................................................. 11

*Young v. Campbell County*,
846 F. App'x 314 (6th Cir. 2021) ...................................................................18, 19

*Youngberg v. Romeo*,
457 U.S. 307 (1982) ............................................................................................. 14

**Constitutional Provisions**

U.S. Const. amend. VIII ....................................................................................... 11

U.S. Const. amend. XIV ....................................................................................... 12

**Regulations**

Ky. Admin. Reg. 501.3 ........................................................................................... 2

## INTRODUCTION

The panel correctly applied an objective standard under the Fourteenth Amendment to Luther Poynter's failure-to-protect claim arising from his detention as a civil contemnor. The County forfeited any argument that a different standard applies, including in its petition for rehearing en banc, and party presentation principles preclude this Court from injecting a different standard now. In any event, the Eighth Amendment does not apply to claims arising from civil contempt, and the Fourteenth Amendment governs conditions-of-confinement claims by civil contemnors. The proper standard under the Fourteenth Amendment is an objective one, consistent with decades of Supreme Court precedent, decisions from this circuit and several sister circuits, and the nature of civil contempt. Regardless of the standard applied, however, the panel correctly concluded that triable issues of fact preclude summary judgment.

## STATEMENT

Barren County Detention Center (BCDC) is a Kentucky jail that in 2020 housed approximately 220 county and state detainees.[1] Panel Op. 1-2. On December 28, 2020, two of those detainees, Timothy Guess and Scotty Wix, were "regulars at the jail." *Id.* at 3-4; Hawkins Dep., R. 100-5, Page ID # 816. Both men had "extensive histories of violence in the jail," which BCDC tracked in incident reports in their files. Panel Op. 4. Collectively, they had assaulted their cellmates without noted provocation eleven times,

---

[1] County detainees are pretrial detainees and convicted misdemeanants. Panel Op. 3 n.1. State detainees have been convicted of felonies but are housed in local jails. *Id.*

including six such assaults in the preceding year and a half. *Id.* at 2, 4-6. One incident involved Guess and Wix teaming up to attack a fellow detainee. *Id.* at 5. Both men also had records of threatening and assaulting staff and fighting with other detainees at BCDC. *Id.* at 4-6. In light of these histories of institutional violence, expert testimony supported the conclusion that Guess and Wix "posed a threat to others and should not have been housed in general population." *Id.* at 7. But BCDC consistently deviated from policies that would have prevented Guess and Wix from harming fellow detainees.

Classification of detainees "is a form of risk assessment used to … minimiz[e] the risk of violence to staff and other detainees." *Id.* Under Kentucky regulations, jails must develop a system providing for separation of detainees "with a tendency to harm others, be harmed by others, or requiring administrative segregation." *Id.* (quoting Ky. Admin. Reg. 501.3). Criteria include the seriousness of the current offense and institutional behavioral history. *Id.* BCDC policy tracks these mandates: It requires that each detainee be classified at intake based on their behavioral history at BCDC, among other things, with each detainee being assigned a classification level of minimum, medium, or maximum security or protective custody/administrative segregation. *See* BCDC Inmate Classification Policy, R. 101-1, Page ID # 854. Like the state regulation, the written policy requires that detainees with a tendency to harm others be separated from fellow detainees. *Id.*

Despite these mandates, BCDC's custom was to ignore prior institutional violence in assigning housing and to bypass the classification analysis set forth in state

2

regulations and its own policy manual. Panel Op. 7-8. Instead, BCDC labeled county detainees with a four-letter initialism indicating whether they were male or female, adult or juvenile, sentenced or pending sentencing, and violent or nonviolent (considering only the nature of the charged offense and the detainee's behavior at arrest and booking). *Id.* at 8; Boston Dep., R. 95, Page ID ## 520-521. State detainees, meanwhile, were classified by the state Department of Corrections, and that classification pertained only to their "work details." Panel Op. 8; Hawkins Dep., R. 100-5, Page ID # 815. Nearly all detainees were housed together in minimum-security general population cells. Panel Op. 22. In December 2020, this included Guess and Wix, who were in minimum-security general population cell 524. Panel Op. 3. Nothing in the record indicates that Guess or Wix was ever classified by BCDC. *Id.* at 8.

Luther Poynter was taken to BCDC on civil contempt for failing to pay $3,000 in child support, and jail staff placed him in cell 524. *Id.* at 2-3. Within 90 seconds of Poynter entering the cell, Guess and Wix approached him where he sat and punched his head repeatedly until he fell to the floor. *Id.* at 3. Poynter suffered a traumatic brain injury requiring an emergency craniotomy, as well as a fractured cheekbone and nose requiring facial reconstruction surgery. *Id.* He is now permanently disabled with partial paralysis and short-term memory loss; he uses a wheelchair and is in assisted living. *Id.*

Poynter, by and through his guardian, sued Barren County, as relevant here, for failure to protect in violation of the Fourteenth Amendment. *Id.* at 9. Following discovery, the County moved for summary judgment, which the district court granted,

3

holding that Poynter failed to demonstrate that the County violated his Fourteenth Amendment rights. *See* MSJ Op., R. 109, Page ID ## 1040-1060.

A panel of this Court reversed. It held that "a municipality can be liable for a constitutional violation 'even in the absence of a showing of a constitutional violation by any one individual.'" Panel Op. 13 (quoting *Grote v. Kenton County*, 85 F.4th 397, 414 (6th Cir. 2023)). After stating that claims by civil and pretrial detainees "'derive … from the Fourteenth Amendment,' and 'not from the Eighth Amendment, with its focus on punishment,'" *id.* at 13-14 (alteration in original) (quoting *Grote*, 85 F.4th at 405), the panel concluded that a reasonable jury could find that the failure to properly classify and separate Guess and Wix was intentional (not accidental); Poynter was at a substantial risk of harm from being housed with two detainees with violent institutional histories; BCDC recklessly disregarded that high risk of harm; and BCDC's failure was the cause of Poynter's injuries. *Id.* at 16-20. Turning to *Monell*, the panel further concluded that a jury could find a clear and persistent pattern of unconstitutional conduct at BCDC, that BCDC had notice of that pattern, and that BCDC tacitly approved of the conduct by taking no action to correct it. *Id.* at 20-25.

The County sought rehearing en banc, arguing that Poynter had not introduced sufficient evidence to show that the risk of harm was personal to him or that there was a clear and persistent pattern of unconstitutional conduct at BCDC. Pet. 10-17, ECF No. 27. This Court granted rehearing en banc and instructed the parties to address in supplemental briefs "whether the court, in resolving this case, should apply the standard

4

articulated in *Farmer v. Brennan*, 511 U.S. 825 (1994), the standard articulated in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), or some other standard." ECF Nos. 30-31.

## ARGUMENT

**I.    This Court Should Apply the Objective Standard Articulated in *Kingsley*.**

### A. Departing from the *Kingsley* Standard Would Violate the Party Presentation Rule.

At every stage, the parties have litigated this case on the mutual understanding that the objective Fourteenth Amendment standard articulated in *Kingsley* applies. The County made no effort to preserve a challenge to that standard in the district court or on appeal and did not raise the applicable standard in its en banc petition, arguing only that the panel erred in its application of the agreed-upon standard. The County has forfeited any argument that a different standard applies, and it would violate the party presentation rule for this Court to sua sponte insert that issue into the case.

"In our adversarial system of adjudication, [courts] follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[I]n the first instance and on appeal, [courts] rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Id.* (alterations omitted) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). "Courts are essentially passive instruments of government." *Id.* at 376 (alterations and citation omitted). "To put it plainly, courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (citation omitted) (summarily reversing

court of appeals on party presentation grounds); *see also, e.g.*, *Westmoreland v. Butler County*, 29 F.4th 721, 745 (6th Cir. 2022) (Bush, J., dissenting) ("We can only decide questions presented by the parties." (citing *Sineneng-Smith*, 59 U.S. at 375)).

The parties have consistently litigated this case on the understanding that Poynter's Fourteenth Amendment claim is governed by an objective standard derived from *Kingsley*. In its summary judgment motion, the County applied *Kingsley*'s objective test. *See* Cnty. MSJ Br., R. 95-1, Page ID ## 441-444. Poynter did the same. Poynter MSJ Br., R. 103, Page ID ## 985-986. And pursuant to the parties' mutual understanding, the district court applied *Kingsley* as the governing standard. *See* MSJ Op., R. 109, Page ID ## 1047, 1058. The parties' arguments on appeal have likewise rested on the shared premise that *Kingsley* applies. *See* Poynter Br. 28-29; Cnty. Br. 16-17. The Court would "transgress[] the party-presentation principle" by sua sponte reconsidering the standard despite the County's unwavering acceptance of *Kingsley* as controlling this case. *Clark*, 607 U.S. at 9.

The County was not foreclosed from arguing for a different standard in the district court or at the panel stage. This case concerns a conditions-of-confinement claim raised by a detainee who was incarcerated pursuant to an order of civil contempt. This Court had previously held that *Kingsley* applies to conditions-of-confinement claims brought by pretrial detainees, *Brawner v. Scott County*, 14 F.4th 585, 594, 596 (6th Cir. 2021), and to excessive-force claims brought by civil contemnors, *Hopper v. Plummer*, 887 F.3d 744, 753 (6th Cir. 2018). But it had never directly addressed whether *Kingsley*

6

also applies to conditions-of-confinement claims brought by civil contemnors. The answer to that question may naturally follow from *Brawner* and *Hopper*, but nothing prevented the County from advocating otherwise.

Even if the County would have faced precedential headwinds in arguing for a subjective standard at prior stages of the case, it certainly could have done so when petitioning for rehearing en banc. It did not. Its petition again took the *Kingsley* standard as a given and sought review only as to the application of that standard to the facts. *See* Pet. 6, 10-17. The Court should stick to the principle that "parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Sineneng-Smith*, 590 U.S. at 375-76 (alteration and citation omitted). The County chose not to contest the application of the *Kingsley* standard, so the Court should apply that standard.

### B. Poynter's Claim Arises Under the Fourteenth Amendment and Thus Implicates the *Kingsley* Standard.

If the Court nonetheless decides to consider the applicable standard, it should affirm that *Kingsley* applies. Because Poynter was jailed for civil contempt, he was not subject to criminal punishment. His claim thus arises under the Fourteenth Amendment, not the Eighth, and must be assessed under *Kingsley*'s objective standard.

**The Fourteenth Amendment's Due Process Clause governs Poynter's claim.** When a convicted prisoner contends that his conditions of confinement violate the Constitution, that claim arises under the Eighth Amendment. *See Farmer*, 511 U.S.

7

at 828. But "the Supreme Court long ago 'took the position that the Eighth Amendment is inapplicable to a civil contempt sentence.'" *Hopper*, 887 F.3d at 755 (alterations omitted) (quoting *United States v. Dien*, 598 F.2d 743, 745 (2d Cir. 1979) (per curiam)). Accordingly, this Court held in *Hopper* that the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's Cruel and Unusual Punishments Clause, governs claims brought by civil contemnors. *Id.* at 752-53. Such claims are assessed under an objective test, "obviat[ing] the need for any analysis under the Eighth Amendment's subjective prong." *Id.* at 752. The same reasoning applies here because Poynter's detention resulted from civil contempt, not a criminal conviction or criminal charges.

"[W]hether a contempt is civil or criminal turns on the 'character and purpose' of the sanction involved." *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 827 (1994) (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911)). "While a criminal contempt sanction is punitive and seeks 'to vindicate the authority of the court,' a civil contempt sanction is remedial and designed to coerce a future act for the benefit of the complainant." *Hopper*, 887 F.3d at 752-53 (quoting *Bagwell*, 512 U.S. at 827-28); *see also United States v. Work Wear Corp.*, 602 F.2d 110, 115 (6th Cir. 1979). Criminal contempt "is a crime in the ordinary sense" and may be imposed only through the usual procedures for obtaining a criminal conviction, *Bagwell*, 512 U.S. at 826 (citation omitted), but civil contempt "is essentially a *civil remedy* designed for the benefit of other parties and has quite properly been exercised for centuries to secure compliance with judicial decrees," *Uphaus v. Wyman*, 360 U.S. 72, 81 (1959) (emphasis

8

added) (citation omitted). Civil contempt imposes "conditional imprisonment," *id.*, in which the detainee "can end the sentence and discharge himself at any moment by doing what he had previously refused to do," *Gompers*, 221 U.S. at 442. The civil contemnor thus "carries the keys of his prison in his own pocket." *Id.* (citation omitted).

Like the plaintiff in *Hopper*, 887 F.3d at 753, Poynter was detained for civil contempt for failing to pay child support, *see* Panel Op. 2. Poynter's booking sheet lists his bond type as "PAY OR STAY," Booking Sheet, R. 95-2, Page ID # 451, indicating that he could end his imprisonment by paying his overdue child support. Poynter "was thus the classic civil contemnor detainee in that he … could 'end the sentence and discharge himself at any moment by doing what he had previously refused to do.'" *Hopper*, 887 F.3d at 753 (quoting *Gompers*, 221 U.S. at 442). In addition, as the panel noted, Panel Op. 14 n.8, attorneys for both sides consistently referred to Poynter's contempt as civil, *see, e.g.*, Sweeney Dep., R. 100-4, Page ID # 783. Indeed, at no point did the County suggest that Poynter was convicted of criminal contempt. *See* Panel Op. 14 n.8 (concluding that the County had forfeited any such argument). Nor is there any indication that Poynter received the procedural safeguards required before criminal contempt can be imposed, such as "notice of charges, assistance of counsel," "privilege against self-incrimination, [and] right to proof beyond a reasonable doubt." *Bagwell*, 512 U.S. at 826. On this record, the only possible conclusion is that Poynter was jailed for civil contempt.

The Eighth Amendment does not apply to civil contemnors like Poynter. *See*

9

*Hopper*, 887 F.3d at 752-53. Poynter "was not a free citizen at the time of the incident, but he had not been convicted of, and was thus not being punished for, any past criminal offense either," meaning he was "protected by the Fourteenth Amendment's Due Process Clause." *Id.* at 754. It is true, as *Hopper* acknowledged, *id.* at 753, that civil contempt has sometimes been called a "punishment," but such labels are not determinative, *Bagwell*, 512 U.S. at 828. What matters is the "character of the relief itself," and civil contempt is coercive, not punitive, distinguishing it from the sorts of punishments that are subject to the Eighth Amendment. *Id.* (citation omitted); *see United States v. Harris*, 582 F.3d 512, 514-15 (3d Cir. 2009) ("Civil contempt orders are intended to be coercive or compensatory in nature"; "[c]riminal contempt, on the other hand, is punitive in nature."); *Manhattan Indus., Inc. v. Sweater Bee ex rel. Banff, Ltd.*, 885 F.2d 1, 5 (2d Cir. 1989) ("It is well settled … that civil contempt proceedings must be 'remedial and compensatory, and not punitive.'" (citation omitted)).

Indeed, the Supreme Court has explicitly identified civil contempt as a type of "imposition[] outside the criminal process" to which the Eighth Amendment is "inapplicable." *Ingraham v. Wright*, 430 U.S. 651, 667-68 (1977); *see also Spallone v. United States*, 487 U.S. 1251, 1257 (1988) (Marshall, J., concurring in part and dissenting in part) ("[I]t appears settled that the Cruel and Unusual Punishments Clause does not apply to civil contempt sanctions."). Every circuit to consider the question has accordingly agreed with *Hopper*'s holding that claims by civil contemnors do not implicate the Eighth Amendment. *See Dien*, 598 F.2d at 745 (holding that "the Eighth Amendment is

10

inapplicable" to a "civil contempt sentence"); *Burrell v. Loungo*, 750 F. App'x 149, 157 (3d Cir. 2018) ("[T]he Eighth Amendment does not apply to [the plaintiff], as a civil contemnor."); *cf. In re Grand Jury Procs.*, 280 F.3d 1103, 1110 (7th Cir. 2002) ("[A] fine assessed for civil contempt does not implicate the Excessive Fines Clause."). Poynter's claim thus arises under the Fourteenth Amendment's Due Process Clause.

**The Fourteenth Amendment requires an objective inquiry.** Because the Fourteenth Amendment governs Poynter's conditions-of-confinement claim, an objective standard applies. As the *Kingsley* Court explained in comparing the Eight Amendment's Cruel and Unusual Punishments Clause and the Fourteenth Amendment's Due Process Clause, "[t]he language of the two Clauses differs, and the nature of the claims often differs." 576 U.S. at 400. These significant differences require different standards for claims arising under each clause. The subjective standard applicable to claims by convicted prisoners is a product of the text and nature of the Cruel and Unusual Punishments Clause, not anything inherent in a conditions-of-confinement claim. The Due Process Clause, by contrast, does not require a subjective inquiry into the mental state of any government actor, as ample precedent confirms.

The Eighth Amendment protects prisoners from "cruel and unusual punishments," U.S. Const. amend. VIII, which includes the "unnecessary and wanton infliction of pain," *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). It follows that a prison official must have a "sufficiently culpable state of mind" to violate the Eighth Amendment. *Id.* The Supreme Court

11

invoked these principles in concluding that a convicted prisoner raising an Eight Amendment conditions-of-confinement claim must establish that an official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Notably, the Court rejected the notion that the term "deliberate indifference" inherently carried a subjective connotation: Although it determined that "acting or failing to act with deliberate indifference to a substantial risk of harm … is the equivalent of recklessly disregarding that risk," it concluded that "the term recklessness is not self-defining" and could be either objective or subjective depending on the context. *Id.* at 836-37. Instead, the Court located its subjective test for claims by convicted prisoners in "the text of the [Eighth] Amendment as our cases have interpreted it." *Id.* at 837.

This reasoning does not apply to claims arising under the Fourteenth Amendment's right to due process of law before any deprivation of life, liberty, or property. *See* U.S. Const. amend. XIV. Unlike the Eighth Amendment, nothing in the text of the Due Process Clause suggests that a deprivation of rights must be driven by a particular mental state to violate the Constitution. Courts evaluating due process claims look to the effect of a government action on a plaintiff rather than the subjective intent of the government actor. *See, e.g.*, *Mirabelli v. Bonta*, 146 S. Ct. 797, 803 (2026) (considering only the objective result of a challenged government policy—that parents were "shut out of participation in decisions regarding their children's mental health"— not the mindset of government actors responsible for the policy).

The Supreme Court has thus consistently held that an objective standard applies

12

to due process claims by pretrial detainees who have not been convicted and therefore are not subject to the Eighth Amendment. In *Bell v. Wolfish*, 441 U.S. 520 (1979), the Court considered claims by pretrial detainees who challenged numerous aspects of their conditions of confinement. It explained that the government may subject a pretrial detainee "to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution." *Id.* at 536-37. Relying on precedent distinguishing between "punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may," the Court concluded that pretrial detention conditions violate due process if they are not "reasonably related to a legitimate governmental objective" or are "arbitrary or purposeless." *Id.* at 537, 539. In most conditions claims, the Court explained, the analysis "generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it],'" without regard to any "expressed intent to punish on the part of detention facility officials." *Id.* at 538 (alterations in original). As such, in applying this standard, the Court did not consider the prison officials' subjective beliefs but rather focused on the objective circumstances surrounding the challenged conditions. *Id.* at 541-43. Several years later, the Court applied the same test to conditions claims brought by pretrial detainees in *Block v. Rutherford*, 468 U.S. 576 (1984), considering whether the challenged conditions were "reasonably related to legitimate governmental objectives" without inquiring into

13

the subjective intent of the jail officials implementing the policies. *Id.* at 585-91.

Indeed, an objective analysis applies to due process claims arising from a number of custodial contexts. "The 'process' that the Constitution guarantees with any deprivation of liberty … includes a continuing obligation to satisfy certain minimal custodial standards." *Collins v. City of Harker Heights*, 503 U.S. 115, 127-28 (1992) (citing cases involving pretrial detainees, individuals in psychiatric institutions, and arrestees). Courts assess objectively whether these custodial obligations have been met. For instance, in considering a substantive due process challenge to the Bail Reform Act, the Supreme Court determined whether the Act's authorization of pretrial detention was impermissibly punitive by asking, in accordance with *Bell*'s objective test, whether the restriction was rationally related to a legitimate government purpose and, if so, whether it nonetheless was excessive in relation to that purpose. *United States v. Salerno*, 481 U.S. 739, 747-48 (1987). The Court applied the same analysis to juvenile preventative detention in *Schall v. Martin*, 467 U.S. 253 (1984), concluding that the challenged detention was regulatory because it was "strictly limited in time," involved "an expedited factfinding hearing," and placed juveniles in facilities that were less restrictive than comparable adult lockups. *Id.* at 269-71. And in *Youngberg v. Romeo*, 457 U.S. 307 (1982), the Court evaluated "whether the extent or nature of restraint or lack of absolute safety" in a psychiatric facility was "such as to violate due process" by "weigh[ing] the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* at 320-21. None of these cases involved an inquiry into the

14

subjective mental state of government actors or whether they knew of any risks to which they had exposed the plaintiffs.

In *Kingsley*, the Supreme Court drew on these principles to conclude that an objective standard applies to excessive force claims brought by pretrial detainees. 576 U.S. at 396-99. It began by noting that the Due Process Clause protects pretrial detainees "from the use of excessive force that amounts to punishment." *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). The Court recognized that *Bell* had stated that "'punishment' can consist of actions taken with an 'expressed intent to punish,'" but it reasoned that "*Bell*'s focus on 'punishment' does not mean that proof of intent (or motive) to punish is required for a pretrial detainee to prevail on a claim that his due process rights were violated." *Id.* at 398 (quoting *Bell*, 441 U.S. at 538). Instead, since "pretrial detainees (unlike convicted prisoners) cannot be punished at all," there was "no need … to determine when punishment is unconstitutional." *Id.* at 400-01. Because *any* punishment of a pretrial detainee is unconstitutional, the inquiry as to whether detention is punitive turns on an objective analysis of whether a "challenged governmental action is not rationally related to a legitimate governmental objective" or whether "it is excessive in relation to that purpose." *Id.* at 398.

This Court invoked this reasoning to apply an objective standard to conditions claims by pretrial detainees. In *Brawner*, the panel majority cited "*Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth

15

Amendment" in concluding that "applying the same analysis to these constitutionally distinct groups is no longer tenable." 14 F.4th at 596. It accordingly concluded that a pretrial detainee asserting a conditions-of-confinement claim must prove that the defendant acted both "deliberately (not accidentally)" and "recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious it should be known.'" *Id.* (quoting *Farmer*, 511 U.S. at 836).

This logic applies at least as strongly to claims by civil contemnors. Claims arising from civil contempt are properly analyzed under the Fourteenth rather than the Eighth Amendment, *see supra*, at 7-11, and therefore must equally be governed by an objective standard. As already explained, "[i]mprisonment" for civil contempt "is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do." *Gompers*, 221 U.S. at 442. Thus, a civil contemnor, like a pretrial detainee, should be able to "prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley*, 576 U.S. at 398; *see also Hopper*, 887 F.3d at 752. The *Kingsley* test, as set forth in *Brawner*, applies.[2]

---

[2] Because Poynter was jailed for civil contempt, not detained on criminal charges, this case is not a proper vehicle to revisit the applicability of *Kingsley* to pretrial detainee conditions-of-confinement claims. Civil contemnors are jailed on different authority and subject to different constitutional limitations than pretrial detainees, and a different analysis applies when determining the standard applicable to each group.

16

**II.    Regardless of the Standard, Poynter Overcomes Summary Judgment.**

**A.  Poynter Suffered Constitutional Injury Under Either Standard.**

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (alteration omitted) (citation omitted). Under this Court's four-part test for failure-to-protect claims, a detainee must prove that government officials "[1] act[ed] intentionally in a manner that [2] put[] the plaintiff at substantial risk of harm, [3] without taking reasonable steps to abate that risk, and [4] by failing to do so actually cause[d] the plaintiff's injuries." *Westmoreland*, 29 F.4th at 729. A reasonable jury could conclude that Poynter satisfies this test under either an objective or subjective standard.

Poynter introduced evidence that Guess's and Wix's placement in a cell with him was not an accident or omission but an "intentional decision," *id.*, part of a "larger custom" of categorizing detainees without reference to their histories of violence—despite a formal policy requiring such consideration—and housing dangerous detainees in minimum-security general population cells, Panel Op. 16, 22-23. Although the tracking software used to store each detainees' file contained a red "alerts" tab with details about prior violent incidents, Bennett Dep., R. 95-3, Page ID # 483, the County by custom did not factor those incidents into the classification and housing of detainees, Boston Dep., R. 95-5, Page ID # 523. In any event, BCDC does not assign detainees minimum-, medium-, or maximum-security levels for purposes of housing them. The only set-apart housing is for those who require "protective custody," not for heightened

17

levels of security based on risk to others, and the sole factor BCDC considers in determining if specific detainees "need to be kept away from others" is whether they have any listed "keep-aparts" compelling their separation from detainees with whom they have known issues. *Id.* at Page ID ## 523-524. The record supports a jury's finding that Guess and Wix were intentionally, not inadvertently, placed in a minimum-security general population cell despite their violent institutional histories.

Second, this placement "exposed" Poynter "to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). Contrary to the County's contention in its en banc petition, "it does not matter whether … a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* This Court "has repeatedly observed that the risk of violent attack by fellow prisoners known to have previously committed serious assaults, absent precautions, can create a substantial risk of serious harm." *Schoonover v. Rogers*, No. 21-3970, 2022 WL 12258998, at *6 (6th Cir. Oct. 21, 2022) (citing *Richko v. Wayne County*, 819 F.3d 907, 916 (6th Cir. 2016), and *Young v. Campbell County*, 846 F. App'x 314, 321 (6th Cir. 2021)). Here, Guess had attacked cellmates six prior times, fought with other detainees twice, threatened still others, and been aggressive toward jail staff four times; Wix, meanwhile, had attacked cellmates six times, fought with other detainees shortly before the attack on Poynter, and attempted to assault jail staff. Panel Op. 4-6, 17. The risk to Poynter "of being housed with and attacked by" two detainees with many "violent assault[s]" on cellmates,

18

including six such assaults in the prior year and a half, constitutes a substantial risk of serious harm. *Richko*, 819 F.3d at 916; *accord Young*, 846 F. App'x at 318.

Under an objective standard, officials took no steps, much less reasonable ones, to abate this risk of harm, of which they should have known. *See Westmoreland*, 29 F.4th at 730. State regulations and official County policy both required consideration of detainees' prior institutional history in classifying them and the separation of detainees with a history of violence from the rest of the population. Guess and Wix both had extensive histories of violence listed in their files. BCDC officials were able to and did access those files on intake and throughout their interactions with detainees. *See* Panel Op. 18. Poynter's expert testified that Guess's and Wix's records of violence signified that they should not have been housed in a general population cell. These facts are sufficient to establish that the County should have known of the need to separate Guess and Wix from fellow detainees and that the failure to abate the ensuing risk was reckless.

Even if this Court were to apply the Eighth Amendment subjective standard to Poynter's claim, a reasonable jury could still find that the County acted recklessly with regard to a substantial risk of harm about which it knew. The existence of "the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted). A jury could well conclude that based on the County's express policy providing that detainees with violent

institutional histories should be separated from the general population, it knew that failure to do so constituted a substantial risk of serious harm to their cellmates; and that given Guess's and Wix's extensive, well-documented histories of violence and jailers' access to those records, the risk as to Guess and Wix specifically was also known. Yet the County followed a custom of ignoring those risks when housing detainees.

The failure to take reasonable steps to abate the risk of harm to Poynter directly caused his injury. A jury could conclude that Poynter established this element by introducing evidence that Guess and Wix had extensive histories of institutional violence at BCDC, which were documented in their files, *see* Panel Op. 4-6; that the County had a custom of housing dangerous detainees with the general population despite their recorded history of institutional violence, *see id.* at 7-9; that if Guess and Wix had been properly classified, they would not have been housed in general population, *see id.* at 7; and therefore that, absent the County's custom, Poynter would not have been in the same cell as Guess and Wix and the attack would not have occurred, *see id.* at 19.

### B. The County Is Liable Under *Monell*.

Finally, the County is liable for its custom of categorizing detainees without accounting for their history of violence in BCDC and housing dangerous detainees in minimum-security general population cells. Although a local government is not vicariously liable under Section 1983 for its employees' unconstitutional acts, it can be sued directly when its "policy or custom" causes injury. *Monell v. Dep't of Soc. Servs. of*

*City of New York*, 436 U.S. 658, 694 (1978). Municipal "custom" can give rise to liability "even though such a custom has not received formal approval through the body's official decisionmaking channels." *Los Angeles County v. Humphries*, 562 U.S. 29, 36 (2010) (quoting *Monell*, 436 U.S. at 690-91).

As a threshold matter, the panel correctly concluded that Poynter did not need to identify a County employee who violated his constitutional rights for the County to be liable. *See* Panel Op. 13. "[I]t is proper to consider possible constitutional violations committed by a municipality *qua* municipality, even in the absence of a showing of a constitutional violation by any one individual officer." *Grote*, 85 F.4th at 414. That is, "even if no individual officer violated the Constitution[,] where constitutional harm has nonetheless 'been inflicted upon the victim' and the municipality is responsible for that harm," the municipality may be liable. *Id.* (quoting *Epps v. Lauderdale County*, 45 F. App'x 332, 334 (6th Cir. 2002) (Cole, J., concurring)). Having established that Poynter suffered a constitutional injury, what remains is to show that the County caused that injury.

The Supreme Court and this Court have articulated different tests for assessing municipal liability for a constitutional injury, but "each approach seeks to answer the same fundamental question: did the municipality cause the harm or did an individual actor?" *Morgan v. Fairfield County*, 903 F.3d 553, 565 (6th Cir. 2018). "Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404-05 (1997). That is, "when an injury is

21

caused by the straightforward carrying out of a municipal policy or custom, the determination of causation is easy." *Morgan*, 903 F.3d at 566. In those circumstances, plaintiffs need only "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that their particular injuries were incurred due to execution of that policy." *Id.* (alterations omitted) (quoting *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)); *accord Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

A more complex analysis is required when a plaintiff alleges that a municipality failed to properly vet or train its employees, who in turn caused constitutional harm. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Brown*, 520 U.S. at 404-05. For failure-to-train claims, as to which "[a] municipality's culpability for a deprivation of rights is at its most tenuous," *Connick v. Thompson*, 563 U.S. 51, 61 (2011), the Supreme Court requires a plaintiff to show "deliberate indifference to the rights of persons with whom the untrained employees come into contact," including "proof that a municipal actor disregarded a known or obvious consequence of his action," and a "pattern of similar constitutional violations by untrained employees." *Id.* (alterations and citations omitted).

Some panels of this Court have suggested that the more demanding failure-to-train standard also applies to a "claim made on the basis of an 'inaction theory,' where a policy of tolerating federal rights violations is unwritten but nevertheless entrenched."

22

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *see also Franklin v. Franklin County*, 115 F.4th 461, 472 (6th Cir. 2024). But those cases, unlike this one, generally involved theories of municipal liability based on an employee's faulty execution of a facially sound policy. *See Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). This Court has cautioned against applying the Supreme Court's failure-to-train test "too broadly" because "[t]here are important differences between" theories of *Monell* liability and courts "must analyze them differently." *Morgan*, 903 F.3d at 566 (citation omitted).

Here, although the panel analyzed Poynter's claim as an inaction theory, the more "straightforward" way to resolve this case is as a challenge to an affirmative County custom of categorizing detainees without considering prior institutional violence and housing nearly all detainees in minimum-security general population cells. *See Brown*, 520 U.S. at 404; *see also Franklin*, 115 F.4th at 471. The implementation of that custom put Poynter in the same cell as Guess and Wix, which led directly, within 90 seconds, to his violent beating while in the County's custody. In that situation, "the determination of causation is easy." *Morgan*, 903 F.3d at 566.

But even if Poynter's claim is analyzed under an "inaction theory," a reasonable juror could find the County liable for the reasons given in the panel opinion. To succeed on an inaction theory, a plaintiff must show "(1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy

23

of inaction; and (4) that the defendant's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Thomas*, 398 F.3d at 429 (alterations omitted) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

As to a clear and persistent pattern of similar constitutional violations, the panel explained that between them, Guess and Wix had been responsible for eleven violent attacks at BCDC before they attacked Poynter. Panel Op. 20. Being generous to the County, the panel did not count each man's first three attacks as constitutional violations. *Id.* at 21. But it concluded that starting with each man's fourth attack, the County had sufficient notice of their violent tendencies that categorizing them as suitable for housing in general population cells constituted a violation of the Fourteenth Amendment rights of other detainees who were subjected to violence. Accordingly, by the time they attacked Poynter, Guess and Wix had both committed at least three prior attacks that violated the Constitution. *Id.* That constitutes a "pattern of similar constitutional violations." *Connick*, 563 U.S. at 62.

In its petition for rehearing en banc, the County claimed that although "Poynter did provide proof of prior incidents at BCDC involving his attackers," he "did not establish that those incidents violated other inmates' Fourteenth Amendment rights." Pet. 15. But as the panel correctly explained, a reasonable jury could interpret the evidence as indicating that the County's failure to properly classify and segregate detainees caused the prior attacks as well. Panel Op. 23. The County's expert testified that any prior classification decisions concerning Guess and Wix would have been

24

documented, but in discovery the County produced no documents indicating that Guess and Wix had ever been classified as dangerous either following their various attacks on other detainees or when re-entering the facility on new offenses. *Id.* "A reasonable trier of fact could therefore infer that the failure to reclassify Guess and Wix based on their violent behavior caused the [prior] assaults." *Id.*

As to the remaining elements, the County had notice of the unconstitutional acts, given that numerous similar incidents involving Guess and Wix occurred within a year and a half of the assault on Poynter, and all of them were documented in incident reports in the two men's files, as the County concedes. *Id.* at 24. The County's failure to take any corrective action despite being on notice of the pattern of unconstitutional conduct involving improperly classified, serially violent detainees constituted tacit approval, such that its failure to prevent violence constituted, at a minimum, an official policy of inaction. *Id.* at 25. And the custom of putting even the most dangerous detainees in low-security general population cells was the "moving force," *Thomas*, 398 F.3d at 429, that led to Poynter's assault, within minutes of the County putting him in a cell with Guess and Wix, who should have been segregated under a proper classification system, Panel Op. 19. The County is therefore liable under *Monell* for its custom of housing detainees without reference to their violent institutional histories.

## CONCLUSION

The Court should reverse the judgment of the district court granting summary judgment to the County and remand to the district court for further proceedings.

Dated:　April 10, 2026

William M. Butler, Jr.
500 West Jefferson Street
Suite 1520
Louisville, KY 40202
(502) 582-2020
wmb@kycriminallawyer.com

Respectfully submitted,

*/s/ Elizabeth R. Cruikshank*
Elizabeth R. Cruikshank
*Counsel of Record*
Kelsi Brown Corkran
William Powell
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY AND PROTECTION,
GEORGETOWN LAW
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-4048
erc56@georgetown.edu

26

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing Supplemental En Banc Brief contains 25 pages in accordance with the briefing order entered on March 11, 2026 (ECF No. 31). I further certify that this brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Garamond font.

*/s/ Elizabeth R. Cruikshank*
Elizabeth R. Cruikshank

## CERTIFICATE OF SERVICE

I hereby certify on April 10, 2026, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Sixth Circuit. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Elizabeth R. Cruikshank*
Elizabeth R. Cruikshank